422 F.2d 685
 FOOD STORE EMPLOYEES UNION, LOCAL 347, AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA, AFLCIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
G. C. Murphy Co., Intervenor.
 No. 21939.
 United States Court of Appeals District of Columbia Circuit.
 Argued January 10, 1969.
 Decided June 3, 1969.
 
 COPYRIGHT MATERIAL OMITTED Mr. Charles Orlove, Chicago, Ill., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of court, with whom Messrs. Mozart G. Ratner, Washington, D. C., and Albert Gore, Chicago, Ill., were on the brief, for petitioner.
 Mr. Elliott Moore, Atty., National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Morton Namrow, Atty., National Labor Relations Board, were on the brief, for respondent.
 Mr. Donald C. Bush, Pittsburgh, Pa., for intervenor.
 Before BAZELON, Chief Judge, McGOWAN and TAMM, Circuit Judges.
 BAZELON, Chief Judge:
 
 
 1
 The Food Stores Employees Union, Local 347, Amalgamated Meat Cutters and Butcher Workers of North America, claims that the National Labor Relations Board acted arbitrarily and capriciously in rejecting the conclusion of its trial examiner that the G. C. Murphy Company violated Section 8(a) (5) and (1) of the National Labor Relations Act[1] by refusing to recognize it as the representative of the employees in an appropriate unit of the company's store at Parkersburg, West Virginia. We find, to the contrary, adequate support for the Board's conclusion that the union had not attained majority status at the time of its demand for recognition in early April 1966. Since the union's other contentions, which deserve and will receive only brief mention, also lack merit, we affirm the order issued by the Board.
 
 
 2
 * The union requested recognition in a unit consisting of all selling and production employees, stockroom employees and restaurant employees, excluding guards, the store manager, restaurant manager, office clerical employees, and supervisory employees. The trial examiner found that the union held valid authorization cards signed by 52 of the 83 employees in this unit, which he agreed was an appropriate one.[2] Since the trial examiner also found that the company "never intended to recognize the Union regardless of any majority it attained," he recommended an order that the employer "recognize and bargain with Local 347."
 
 
 3
 The Board found that the employer had violated Section 8(a) (1) in a variety of ways.[3] In respect to the refusal to bargain, however, the Board concluded that an appropriate unit for this smallish retail store should include office clerical employees, and accordingly added five office girls and three merchandise girls to the unit described by the trial examiner. The Board also included in the unit six floor girls whom the trial examiner had excluded as supervisors, as well as three part-time workers excluded by the trial examiner as casual employees and one woman on sick leave whom the trial examiner had excluded as unlikely to return to work. Finally, the Board excluded as a casual employee a part-time worker included by the trial examiner.
 
 
 4
 The net effect of these modifications in the unit requested by the union and accepted by the trial examiner was to raise the number of employees involved from 83 to 100. Since none of the employees added had signed an authorization card, whereas the now excluded em-employee had, the number of valid authorization cards was reduced from 52 to 51. The Board also rejected three cards dated after the union's demand for recognition, as well as a card signed by one Virgina Poling who was not a member of the unit as defined by either the Board or the trial examiner. This reduced the number of valid cards to 47.[4]
 
 
 5
 At the completion of this process, the Board found that the union in April 1966 had not attained majority status in an appropriate unit of 100 employees. Consequently it rejected the order to bargain recommended by the trial examiner and dismissed the allegation that the company violated Section 8(a) (5) of the statute.
 
 II
 
 6
 The union contends that the Board erred in determining an appropriate bargaining unit and, alternatively, that the unit requested by the union did not differ so substantially from the unit eventually approved by the Board as to relieve the employer of its duty to bargain collectively. The union's argument on this latter score is misplaced. We have held that an employer cannot claim to have had a good faith doubt a union requesting recognition represented a majority of his employees unless the "variance between the unit sought and the unit later found appropriate can be characterized as `substantial.'" Brewery & Beverage Drivers & Workers v. NLRB, 103 U.S.App.D. C. 190, 192, 257 F.2d 194, 196 (1958). But that is not the issue here.
 
 
 7
 A finding that an employer has violated Section 8(a) (5) by refusing to bargain requires two elements: "first, that a majority of the members of the appropriate bargaining unit have freely designated the Union as their bargaining agent; and, second, that the Company's denial of recognition was not in good faith." Amalgamated Clothing Workers of America v. NLRB, 124 U.S.App.D.C. 365, 373, 365 F.2d 898, 906 (1966). If the latter issue of good faith is at stake, the employer may sometimes justify a refusal to bargain by demonstrating a sincere belief that the union's requested unit was inappropriate and that the union did not enjoy majority status in any appropriate unit, or by showing that the unit demanded by the union varied so significantly from any appropriate unit that the request for recognition was too far from the mark to be valid.
 
 
 8
 But the "lack of good faith doubt is immaterial if in fact no majority existed." NLRB v. S. E. Nichols Co., 380 F.2d 438, 442 (2d Cir. 1967). And in this case the Board ruled not that the company acted in good faith, but that the union did not represent a majority of the employees in an appropriate unit. On this score, the degree of variance between the unit requested by the union and that found appropriate by the Board is immaterial: the question, and the only question, is whether a majority existed in the unit approved by the Board on the date the union demanded recognition.
 
 III
 
 9
 The determination of an appropriate bargaining unit involves two inquiries. The first question is which individuals are "employees" within the policy of the Act; the next is what group within the class of employees shares a community of interests such that representation by a single bargaining agent will meet the statutory goal of "assur[ing] to employees the fullest freedom in exercising the rights guaranteed"[5] by the Act. The addition of three part-time workers and the exclusion of a fourth, as well as the inclusion of a woman on sick leave at the time of the recognition drive, involved the preliminary inquiry of who is an employee. The Board acted reasonably, we believe, in concluding that three women who worked respectively 10, 16 and 20 hours a week on a regular basis deserved to be included in any collective bargaining unit. Similarly, the exclusion of Leland Queen, who worked only irregularly as a replacement for absent or ill employees during March and April 1966, was also reasonable.
 
 
 10
 Rheba Dahmer had been receiving sick-leave benefits for approximately six months at the time of the union's demand for recognition. Partly because she was 60 years old, the trial examiner concluded there was no reasonable expectancy she would return to work. The Board disagreed. As with the part-time employees, we find no reason to reject the Board's determination. The fact that the Board reversed its trial examiner is of minimal importance. Unlike, for example, an alleged discriminatory discharge where demeanor evidence bearing upon intent may possibly entitle the findings of a trial examiner to special respect, the underlying facts were not in dispute here. The task rather was to decide from the undisputed facts whether these individuals should be considered employees. In exercising this judgment the Board owed no deference to its trial examiner. Cf. Universal Camera Corp. v. NLRB, 340 U.S. 474, 494-496, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Oil, Chemical & Atomic Workers v. NLRB, 124 U.S.App.D.C. 113, 116, 362 F.2d 943, 946 (1966).
 
 
 11
 The same is true of the six floorgirls whom the trial examiner excluded as supervisors but whom the Board included. Section 2(3) of the Act excludes from its definition of employee "any individual employed as a supervisor."[6] Section 2(11) in turn defines supervisor as
 
 
 12
 any individual having authority * * to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsible to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of authority is not of a merely routine or clerical nature, but requires the use of independent judgment.[7]
 
 
 13
 According to the testimony before the trial examiner, the floorgirls shifted salesgirls from counter to counter, co-ordinated lunch schedules, directed salesgirls to keep their counters neat, and assisted other employees who needed help. A company instruction sheet introduced into evidence, moreover, stated generally that a floorgirl must "direct the efforts of all employees under her supervision."
 
 
 14
 As far as the instruction sheet is concerned, it is well established that "theoretical of paper power will not suffice" to make an individual a supervisor. NLRB v. Security Guard Service, 384 F.2d 143, 149 (5th Cir. 1967). The test is what power the worker actually exercises, and the finely-shaded gradations of power in any enterprise proscribe a wooden reading of Section 2(11). Almost any employee "directs" other employees in some fashion at some time. The mere fact that a worker exercises one or more of the functions listed by the statute cannot be determinative, therefore. Section 2(11) must function as a guide rather than a checksheet, and the Board is far more able than this court to evaluate "the infinite possible variations in responsibilities enumerated in [the statute]." International Union of United Brewery etc. Workers v. NLRB, 111 U.S.App.D.C. 383, 389, 298 F. 2d 297, 303 (1961) cert. denied, Gulf Bottlers Inc. v. NLRB, 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847, (1962); see also NLRB v. American Oil Co., 387 F.2d 786, 788 (7th Cir. 1967), cert. denied, 391 U.S. 906, 88 S.Ct. 1656, 20 L.Ed.2d 420 (1968).
 
 
 15
 We see no reason to disturb the Board's judgment in this case. While the floorgirls direct other salesgirls within a limited sphere, their supervisory functions are tightly circumscribed. They make only minor adjustments in work schedules, which are the primary responsibility of assistant managers who are admitted supervisors. They have no authority to hire, discharge, suspend, lay off, recall, promote or discipline other workers. Most important, perhaps, is the fact that they spend 50 to 60 per cent of their time actually selling to customers. In view of all this, the Board acted well within the limits of its discretion in categorizing them as employees rather than supervisors.
 
 IV
 
 16
 Unlike the part-time workers and floorgirls, there is no question but that the office clericals and merchandise girls were employees. The question is whether the Board acted consistently with the policies of the Act and its own previous decisions in including them in the bargaining unit. The guidance provided by the Act in this case is nugatory. Section 9(b), mentioned above, directs the Board to fashion bargaining units that will "assure * * * employees the fullest freedom in exercising the rights guaranteed" them by the Act, but leaves this skeletal command without flesh. Section 9(c) (5) provides that "in determining whether a unit is appropriate * * * the extent to which the employees have organized shall not be controlling."[8] But unless the Board were to be accused of determining a bargaining unit in order to deny the union a majority status — a novel contention — that section seems uninvolved here, since the union did not represent a majority of the unit as augmented by the Board.
 
 
 17
 The Union does not attempt to argue, however, that the Board violated whatever policies may be embodied in the Act. Its contention rather is that the Board ignored its own precedents finding that office employees share sufficiently different interests to warrant their exclusion from units of other non-selling as well as selling employees. The Board, however, distinguishes the three cases principally relied upon by the union — commonly called the Stern's trilogy[9] — as involving large retail stores with distinct functional groupings of employees rather than a relatively small outlet such as the G. C. Murphy Company store in Parkersburg, where employees have similar working conditions and related overlapping work functions.
 
 
 18
 This distinction would be attractive if it in fact explained all the Board's decisions. The Stern's trilogy marked a departure from "the long line of Board decisions declaring a storewide unit to be the appropriate unit in the retail industry." Retail, Wholesale & Department Store Union v. NLRB, 128 U.S.App.D.C. 41, 44, 385 F.2d 301, 304 (1967).[10]
 
 
 19
 The decisions approving storewide units including office clericals had been reasoned in terms of the greater functional similarity and more frequent interchanges between office clericals and selling personnel than between clericals and manufacturing employees, which have traditionally had separate bargaining units.[11] When cases involving large department stores with well-compartmentalized working forces came before the Board, approval of separate bargaining units was proper. And, conversely, adherence to the previous line of decisions would seem appropriate in cases involving small stores with more fluid working conditions and more fungible employees.
 
 
 20
 The union, however, argues that the Board has applied no such well-articulated and consistent policy, advancing the decision in Heck's, Inc., 156 N.L.R.B. 760 (1966), enf. denied on other grounds, 386 F.2d 317 (4th Cir. 1967). That case, decided less than four months before the organizing campaign involved here, involved a small store in the same town of Parkersburg, West Virginia, and the same union. The Board, citing Stern's, Paramus, 150 N.L.R.B. 799 (1965), excluded all office clericals.
 
 
 21
 In a subsequent decision involving the same employer where office clericals were excluded as in this case, the Board distinguished Heck's as "based upon a stipulation by the parties to exclude the clerical employees." Heck's, Inc., 159 N.L.R.B. 1151, 1152 n. 1 (1966); see also Heck's, Inc., 156 N.L.R.B. 760, 771, 775 (1966) (trial examiner's decision). We are not fully persuaded by this reasoning. The Board has apparently made something of a practice of including or excluding office clericals from bargaining units in the wholesaling industry according to the wishes of the union or the employer.[12] But whatever the considerations which should govern the determination of an appropriate bargaining unit, Section 9(b) indicates that the rights of employees and not the desires of unions or employers must be determinative.
 
 
 22
 Whether the decision in the Heck's case which immediately preceded this recognition drive was rightly decided or not, however, subsequent decisions of the Board suggest that office clericals will normally be included in small retail store bargaining units.[13] The dividing line between "large" and "small" retail store is unclear.[14] But the distinction is not irrational, at least when the Board looks to the actual work performed by different employees as well as the size of the store involved.
 
 
 23
 In this case the Board included office clericals and merchandise girls in the bargaining unit not only because of the "relatively small employee complement," but also because the workers involved "share a community of interest with other unit employees" because of their "similar working conditions and related, overlapping work functions." Since the record shows that merchandise girls and office clericals also sell upon occasion, and were hired as salesgirls before assuming their present functions, we find that the Board was not arbitrary or capricious in determining the bargaining unit settled upon.
 
 V
 
 24
 The union also contends that the Board erred in refusing to find additional violations by the employer of Section 8(a) (1) of the Act. We agree with the Board, however, that the G. C. Murphy Company acted within its rights in keeping a nonemployee union organizer under observations while he was in the store and in ejecting him when he attempted to distribute flyers on the selling floor. The employer could have lawfully excluded the organizer from this area of the store during these hours altogether; we can see no impropriety in the less restrictive alternative of surveillance under these circumstances.
 
 
 25
 The Board found no evidence that a sign requiring solicitors to obtain an authorization card from the city Chamber of Commerce was directed or applied against employees; since this is so, we cannot agree with the union that the employer violated Section 8(a) (1) by posting the sign. We also find no reason to tamper with the conclusion of both the trial examiner and the Board that certain remarks made to an employee by a supervisor accusing her of friendship with the union organizer were made in jest and did not violate the Act.
 
 
 26
 The union's final plaint is that the trial examiner acted improperly in curtailing its right to cross-examine witnesses at the hearing. The right to cross-examine does not extend to the right to cross-examine endlessly, however. Trial examiners like trial judges must draw a halt somewhere, and our scrutiny of the record fails to convince us that the examiner in this case overstepped his discretion in his conduct of the hearing.
 
 
 27
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 29 U.S.C. §§ 151-168 (1964)
 
 
 [2]
 The trial examiner stated that there were 80 employees. He apparently arrived at this figure by excluding 23 employees from the list of 103 employees submitted by the General Counsel. Two of these employees — Mary Davis and Ralph Wallace — were not on the list, however. In addition, the trial examiner included Leland Queen in the unit, although he was not on the list submitted by the General Counsel, making the correct total 83
 
 
 [3]
 The employer has agreed to comply with the order of the Board premised upon these violations, which consequently are not before this court for review
 
 
 [4]
 The Board found in its opinion that the union held only 46 valid cards on April 13, apparently by excluding again one card already excluded by the trial examiner and thus subtracting six cards instead of five from the 52 accepted by the trial examiner. The Board agrees in its brief that the correct figure is 47
 
 
 [5]
 Section 9(b), 29 U.S.C. § 159(b) (1964)
 
 
 [6]
 29 U.S.C. § 152(3) (1964)
 
 
 [7]
 29 U.S.C. § 152(11) (1964)
 
 
 [8]
 29 U.S.C. § 159(c) (5) (1964)
 
 
 [9]
 Arnold Constable Corp., 150 N.L.R.B. 788 (1965); Stern's Paramus, 150 N.L. R.B. 799 (1965); Lord & Taylor, 150 N.L.R.B. 812 (1965)
 
 
 [10]
 But cf. note 12 infra and accompanying text.
 
 
 [11]
 See, e. g., Baldwin Supply Co., 159 N.L. R.B. 745 (1966), enforced, 384 F.2d 999 (4th Cir. 1967) (per curiam).
 
 
 [12]
 See, e. g., Schieffelin & Co., 129 N.L. R.B. 956, 957 (1960); Labatt Wholesale Grocery Co., 130 N.L.R.B. 228, 230 (1961). The Board also has precedents of long standing approving separate units for office clericals in retail stores where a union wishes to represent that group. See Montgomery Ward & Co., 100 N.L. R.B. 1351 (1952); Albert's, Inc., 91 N.L.R.B. 522 (1950); Maas Bros., 88 N.L.R.B. 129 (1950); Meier & Frank Co., 86 N.L.R.B. 517 (1949).
 
 
 [13]
 In addition to Heck's, Inc., 159 N.L. R.B. 1151 (1966),see Heck's, Inc., 166 N.L.R.B. No. 32 (1967); Heck's, Inc., 170 N.L.R.B. No. 53 (1967).
 
 
 [14]
 In a recent case involving a store with apparently about 200 selling employees (about twice as many as the store here involved, but markedly smaller than the stores involved in theStern's trilogy, supra note 9), the Board cited Stern's Paramus, 150 N.L.R.B. 799 (1965), in excluding office clericals. See Sears, Roebuck & Co., 174 N.L.R.B. No. 28 (1969), and 172 N.L.R.B. No. 132 (1968).