445 F.2d 237
 OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
George A. Angle, d/b/a Kansas Refined Helium Company, Intervenor.
George A. ANGLE, d/b/a Kansas Refined Helium Company, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 23295.
 No. 23300.
 No. 23750.
 No. 23751.
 United States Court of Appeals, District of Columbia Circuit.
 Argued November 3, 1970.
 Decided May 27, 1971.
 
 Mr. Jerry D. Anker, Washington, D. C., for petitioner in Nos. 23,295 and 23,300.
 Mr. Marvin J. Martin, with whom Mr. W. Stanley Churchill, Wichita, Kan., was on the brief, for petitioner in Nos. 23,750 and 23,751 and intervenor in Nos. 23,295 and 23,300.
 Mr. Joseph E. Mayer, Atty. National Labor Relations Board, for respondent. Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Allison W. Brown, Jr., and Harold B. Zanoff, Attorneys, National Labor Relations Board, were on the brief for respondent.
 Before McGOWAN and TAMM, Circuit Judges, and MATTHEWS,* Senior District Judge.
 McGOWAN, Circuit Judge:
 
 
 1
 These petitions for review, filed by the union (Oil, Chemical and Atomic Workers International, AFL-CIO) and the employer (Kansas Refined Helium Company), bring before us two related orders of the National Labor Relations Board. The Board has also filed a cross-petition for enforcement. Finding upon examination of the numerous issues raised that the Board has committed no errors of law and that its findings are amply supported by substantial evidence, we deny both petitions for review and grant the Board's request for enforcement.
 
 
 2
 * The issues presented here arise from a fact pattern which has become familiar to this court and to the other Courts of Appeals in reviewing the Board's unfair labor practice decisions. The dispute in this instance arose under the following circumstances. Shortly after the employer took over the operation of a newly constructed helium plant, the union with the assistance of several key employees launched a campaign to organize the plant's production and maintenance personnel. The union quickly obtained signed union authorization cards from 18 of the 22 employees involved. Upon being notified that a majority of its employees had signed cards designating the union as their collective bargaining representative, the employer called for a formal election to be conducted by the Board.
 
 
 3
 During the months before the scheduled election the employer, through the conduct of its sole owner, engaged in numerous activities in an apparent effort to dissipate employee enthusiasm for union representation. The Trial Examiner found that the employer had committed unfair labor practices in violation of Section 8(a) (1) of the Labor Management Relations Act, 29 U.S.C. § 158(a) (1) (1964), by coercively interrogating each employee in the plant, by making statements to several of its employees indicating an animus toward the union, and by making veiled threats against the union and its sympathizers in a speech at a dinner given for all the employees. The Examiner also found violations of Section 8(a) (3), (5), and (1) of the Act, 29 U.S.C. § 158(a) (3), (5), (1) (1964), in (a) the discriminatory discharge of 6 pro-union employees, (b) the granting of a unilateral wage increase immediately prior to the date scheduled for the election, and (c) the persistent refusal to bargain with the employees' designated representative. The Board approved each of the Examiner's conclusions, 176 N.L.R.B. No. 115, and since, viewed as a whole, the record amply reflects the existence of substantial supporting evidence, we affirm the Board's findings.[1]
 
 
 4
 The second Board order under review, 176 N.L.R.B. No. 116, deals exclusively with the suspension and second discharge of one of the 6 pro-union employees who had been previously discharged and reinstated. The Trial Examiner and the Board found that this discharge constituted an unfair labor practice offending Section 8(a) (3), (4), and (1), 29 U.S.C. § 158(a) (3), (4), (1) (1964). This finding is also clearly founded upon substantial evidence, and we leave it undisturbed.
 
 
 5
 In so sustaining the Board's orders as against the claims of error pressed upon us by the employer,[2] the single substantive issue meriting extended exposition is the "aging but nevertheless persistently vexing problem of whether or not an employee is a supervisor."[3] That inquiry here focuses on the status of the plant's "senior operators."
 
 II
 
 6
 The Labor Management Relations Act in terms confers upon employees the rights of self-organization, collective bargaining through chosen representatives, and engaging in concerted activities for their mutual benefit. Section 7, 29 U.S.C. § 157 (1964). The Act further protects employees from the unfair labor practices of their employers which interfere with those rights. Section 8(a), 29 U.S.C. § 158(a) (1964). Section 2(3), as pertinent to our consideration, defines the term "employee" as follows: "The term `employee' shall include any employee * * * but shall not include * * * any individual employed as a supervisor * * *." 29 U.S.C. § 152(3) (1964). Given this statutory framework, it is critical, both in ascertaining the appropriate bargaining unit and in evaluating allegations of unfair labor practices, to determine whether particular individuals are "employees" or "supervisors."[4] Quite understandably, this statutory dichotomy has spawned substantial Board and appellate litigation. The statutory definition with which we deal reads in full:
 
 
 7
 "The term `supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not merely routine or clerical in nature, but requires the use of independent judgment."
 
 
 8
 Section 2(11), 29 U.S.C. § 152(11) (1964).
 
 
 9
 The Board found the class of employees in question here not to be supervisors. In applying the statutory test to the factual setting of this case, the Board's decision is, of course, entitled to great weight. The substantial evidence standard for review of agency fact determinations (Section 10(e), (f), 29 U.S.C. § 160(e), (f) (1964)) takes on special significance where the issue lies so squarely within the Board's ambit of expertise. On this score we find ourselves in firm agreement with a recent opinion by Judge Waterman of the Second Circuit:
 
 
 10
 "Inasmuch as infinite variations and gradations of authority can exist within any one industrial complex and any drawing of the line between the personnel of management and the rank and file workers may require some expertise in evaluating actual power distributions which exist within an enterprise, the Board's findings relative thereto are entitled to great weight."
 
 
 11
 NLRB v. Metropolitan Life Ins. Co., 405 F.2d 1169, 1172 (2d Cir. 1968). See also Food Store Employees Union, Local 347 v. NLRB, 137 U.S.App.D.C. 248, 253, 422 F.2d 685, 690 (1969); Amalgamated Clothing Workers v. NLRB, 137 U.S. App.D.C. 93, 97, 420 F.2d 1296, 1300 (1969). With that limitation on our review power in mind, we turn to a consideration of the facts underlying the Board's decision.
 
 
 12
 Kansas Refined Helium Company is a highly automated plant engaged primarily in the process of extracting helium from natural gas. The facility is in operation around the clock, seven days a week, and is staffed by approximately 25 persons spread out over three sucessive shifts. Filling the top positions of responsibility are the plant manager, the operations and engineering manager, and the chief of maintenance. These three fall clearly within the management echelon and there is no controversy as to their supervisory status. The remainder of the employees, with the exception of several repair and maintenance personnel, are classified as either senior or junior operators. It is the status of the four senior operators, all of whom signed union authorization cards and some of whom participated in soliciting signatures from other employees, which is the critical issue in this proceeding.
 
 
 13
 The responsibilities of the "operating" employees — the senior and junior operators — consist primarily of observing the indicators and gauges, which reflect the progress of the various stages in the refining process, and of making adjustments as necessary. On each shift there is one senior operator and either two or three junior operators. Generally the senior operator stations himself in the main control room in front of the central indicator board; the junior operators move throughout the plant performing other routine functions such as checking machinery and controls in the outbuildings. The standard operating activities of both the senior and junior operators are performed in accordance with an instructional manual known as the "blue book." Any nonroutine instructions, required to take care of unusual circumstances, are assigned by the three managerial supervisors. Communication of such special instructions from one shift to the next is accomplished through notations penciled into the "special orders book" by the assigning manager. This book is periodically consulted by all operators. One of the responsibilities of each senior operator is to ascertain that the junior operators on his shift have fulfilled any such special assignments.
 
 
 14
 Because of the full-time operation of the plant, there are many hours during the day when the managerial supervisors are not present. The employer has relied heavily in these proceedings on this fact as indicating that, at least during substantial segments of any workday, the senior operators do have the obligation "responsibly to direct" the junior operators on their shifts. It is clear, however, that all but the routine directives come directly from the plant managers rather than from the senior operators. Furthermore, there is ample evidence that, in cases of emergency, or whenever unusual circumstances have arisen at the plant, the senior operators were instructed to communicate with the plant manager rather than to exercise "independent judgment." Under these circumstances slight weight can be given to the consideration that senior operators are often on duty with no supervisor over them. Compare Ohio Power Co. v. NLRB, 176 F.2d 385, 386 (6th Cir.), cert. denied, 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553 (1949) (broad emergency power), with NLRB v. Security Guard Serv., 384 F.2d 143, 148 (5th Cir. 1967), and United States Gypsum Co., 116 N.L.R.B. No. 91, 1956-1957 CCH NLRB Dec. ¶ 54,013, at 53,946-947 (no emergency power).
 
 
 15
 In addition to its argument regarding the full-time nature of plant operations, the employer directed the Board's attention to a number of other factors which it contends lead inescapably to the conclusion that the four senior operators are within the supervisory structure. Great reliance is placed on the pay differential between the two classes of operators: the seniors receive 80 to 85 cents more per hour than their junior counterparts. The employer's position is that, since the plant's training program is the same for both classes and since junior operators not infrequently perform the senior operator's tasks in his absence, thereby tending to show that their skills are comparable, income disparity cannot be accounted for in any way other than as a reflection that the company is compensating the senior operators for their added responsibilities in exercising authority and control over the junior operators.
 
 
 16
 The Trial Examiner rejected this thesis, finding that the pay difference could be fairly attributed to other factors, such as the senior operators' seniority in length of service over most of the junior operators. It is also reasonable to conclude, as the Trial Examiner did, that the pay of senior operators simply reflects the value to the employer of the technical responsibilities performed in the plant's "nerve center." Furthermore, we have discovered no cases in which disparities in compensation were accorded litmus paper significance in the absence of solid evidence of the actual possession of supervisory responsibility. See, e. g.,United States Gypsum Co., supra, at 53,947. Such evidence is lacking in this record.
 
 
 17
 While the employer conceded before the Board that "the senior operators did [not] actually suspend, lay-off, recall, promote, transfer or discharge" employees, it contended that senior operators could "effectively recommend" wage increases for junior operators and could also "effectively recommend" disciplinary action where necessary. The testimony of the plant manager is, we think, dispositive against the employer on both counts. On the question of disciplinary action, the plant manager testified that he had informed the senior operators that, although their recommendations would receive considerable weight, in cases of disciplinary controversies they were to take no direct action themselves but were instead to call the plant manager who would come to the plant immediately. As to the question of whether senior operators exercised supervisor-type functions with respect to wage increases, the evidence is that only one of the four senior operators had ever recommended pay raises for the junior operators on his shift. And, in that isolated instance, plant-wide wage increases had already been contemplated and the decision to grant the raises was made by the plant manager without appreciable reliance on the senior operator's evaluation. We think the Board's decision that no supervisory power was visible in these areas of the senior operators' activities finds substantial support in the record and warrant in the case law. Compare NLRB v. Southern Bleachery & Print Works, Inc., 257 F.2d 235, 238 (4th Cir. 1958), cert. denied, 359 U.S. 911, 79 S.Ct. 588, 3 L.Ed. 2d 575 (1959) (machine printers not supervisors), with NLRB v. Metropolitan Life Ins. Co., supra, 405 F.2d at 1174-1177 (watch engineers are supervisors).
 
 
 18
 Finally, the Trial Examiner considered the several notices and directives which had been posted in the plant from time to time, and which were offered as indicators of management's view of the senior operators' role in the operation of the facility. Included in those notices were statements indicating that senior operators were to be "responsible" for their shift, that they were to "supervise the personnel on [their] shift," that a particular senior operator had been assigned "to run the fourth shift," and that each senior operator "shall follow up these instructions and see that the employees take care of [particular tasks]."[5] Ordinarily we would find such internal memoranda and notices to be of substantial probative worth when, as here, they were prepared and circulated prior to the time that any campaign had been undertaken within the company to designate the union as the employees' bargaining representative. In such an atmosphere, untainted by live controversies over the statutory status of any particular group of employees, management's statements conferring responsibilities and allocating duties are likely to be more reliable than similar statements made in the context of union conflict when directives are often addressed as much to the Board as they are to the company's personnel.
 
 
 19
 While most of the company notices relied on here were posted prior to the advent of labor disputes, the Board nonetheless found them unpersuasive because they were unsupported by evidence that they constituted anything more than naked designations of "paper power." We agree that, beyond the statements or directives themselves, what the statute requires is evidence of actual supervisory authority visibly translated into tangible examples demonstrating the existence of such authority. In NLRB v. Security Guard Serv., Inc., 384 F.2d 143, 149, the Fifth Circuit succinctly stated the essential point:
 
 
 20
 "* * * What is amiss with this argument which is based on paper credentials is that there is lack of actual authority to match. The concept of supervision has some elasticity, but it must have substance and not be evanescent. * * * A supervisor may have potential powers, but theoretical or paper power will not suffice. Tables of organization and job descriptions do not vest powers. * * *"
 
 
 21
 See also Food Store Employees Union, Local 347 v. NLRB, supra 137 U.S.App. D.C. at 253, 422 F.2d at 690; NLRB v. American Oil Co., 387 F.2d 786 (7th Cir. 1967).
 
 
 22
 The employer, challenging the Examiner's refusal to draw controlling inferences of supervisory responsibility either from such internal directives or from testimony offered by company witnesses, accuses the Board of violating a judicial rule employed in evaluating personnel status, i. e., that it is the existence of any of Section 2(11)'s enumerated powers, rather than their exercise, that is critical. See, e. g., West Penn Power Co. v. NLRB, 337 F.2d 993, 996 (3d Cir. 1964); Ohio Power Co. v. NLRB, supra, 176 F.2d at 388. The language on which the employer relies as showing that the Examiner and the Board have fallen into error is the statement, found in the former's Preliminary Decision, that "where the facts concerning supervisory status are in dispute, as they are here, I regard evidence of supervisory power exercised — or not exercised — as far more persuasive than self-serving testimony concerning their mere conferral."
 
 
 23
 It is a well settled proposition, mandated by the statute, that, once the existence of supervisory authority is established, the degree or frequency of its exercise is of little consequence. We do not, however, read the Examiner's opinion as quarreling with that proposition. On the contrary, it is the very issue of the existence of authority on which his inquiry is focused. The thrust of his conclusion is that, while numerous allegations of supervisory authority have been made, the nearly total lack of evidence of authority actually exercised negates its existence. See NLRB v. Southern Bleachery & Print Works, Inc., supra, 257 F.2d at 239; NLRB v. Leland-Gifford Co., 200 F.2d 620, 625 (1st Cir. 1952). We do not see how the Examiner could have concluded otherwise in the face of the clear mandate of Section 2 (11) that a supervisor is not merely one who has "authority" to act in the interest of the employer but is one who, in the "exercise of such authority," is required to use "independent judgment." On this record we find substantial evidence to support the finding that the senior operators were not supervisory personnel within the contemplation of the statute but were merely "lead men"[6] among the operating employees on each shift. Our affirmance of the Board's order is not, therefore, precluded by this claim of supervisory status.[7]
 
 III
 
 24
 In addition to our conclusions that there is substantial evidence to support the Board's findings both as to unfair labor practices and as to the status of the senior operators, we find the several remedies fashioned by the Board to be appropriate. The major remedial measures imposed included orders that the employer (1) cease and desist from its unlawful practices, (2) recognize and bargain with the union, (3) reinstate the discharged employees, and (4) award back pay to the dischargees computed in the customary manner.
 
 
 25
 First, the union has contested the determination that the dischargees' back pay award is to be limited to net back pay (back pay offset by interim earnings at other employment) rather than gross back pay. The union's argument, that only full back pay would "effectuate the purposes of the Act" as required by Section 10(c), 29 U.S.C. § 160 (c) (1964), rests on two propositions.[8] The union first points out that net back pay is always inadequate because it can never make a discharged employee whole. This is so because the remedy fails to take into account such factors as inflation, the humiliation of being fired, and the frustration of searching for another job. Furthermore, the 6 percent interest allowed fails to recoup the interest that a discharged employee might have been forced to pay on money borrowed to sustain himself and his family during the period of joblessness. Nor does net back pay make allowance for such intangibles as the loss of credit occasioned by the dischargee's inability to maintain payments on debts incurred prior to his discharge. The union's second point is that the Board's refusal to invoke a remedy which fully compensates discharged employees discourages them, and all employees generally, from exercising to the fullest extent their statutory rights. An employee who knows that the Board's actions will not fully protect him in the event of an unlawful discharge will be, to that extent, reluctant to assert his rights in their fullest range.
 
 
 26
 While the reasoning of this challenge to the customary net back pay remedy would appear to have equal applicability to all reinstatement orders, the union asks that this standard remedy be laid aside in favor of full back pay only in cases in which the employer's conduct has been "particularly egregious," as the union contends that the employer's conduct in this proceeding has been. The Trial Examiner, after careful consideration of the union's contentions, concluded that under the facts of this case the requested remedy was neither necessary nor appropriate to effectuate the Act's policies.[9] In support of that conclusion he pointed out that there was no evidence of record that the employer had such a history of violations that only a more drastic remedial measure could assure compliance with the Act. His decision was buttressed by his further conclusion that the proposal to eliminate the interim earning offset was more punitive than remedial, and that punitive remedies "have not been considered authorized by the Act."
 
 
 27
 The union readily agrees that the Board's powers are remedial in nature and that it "could not award gross back pay for the purpose of punishing the employer." See Republic Steel Corp. v. NLRB, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940); Local 60, United Broth. of Carpenters and Joiners of America Local v. NLRB, 365 U.S. 651, 655, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961). The union further concedes that full back pay is no more directly responsive to the sorts of collateral and intangible harms suffered by discharged employees than is net back pay; its claim is that the former provides "more complete compensation" for the employees' losses. While the union persistently asserts that its proposed remedy falls well on the permissible side of the thin line between compensation and punishment, it makes no effort to place a dollar figure on the inadequacies of net back pay. Nor does it attempt to quantify the difference, as to these discharged employees, between net and gross. In light of the union's contention that the remedy should only obtain in cases of egregious employer conduct, we cannot fault the Board for viewing the full back pay alternative, at least based on the union's showing here, as essentially punitive. Contrarily, the net back pay order entered in this case cannot, on this record, be said to be "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." NLRB v. J. H. Rutter-Rex Mfg. Co., 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405 (1969), quoting NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 346-347, 73 S.Ct. 287 (1953).[10]
 
 
 28
 The employer has attacked another facet of the Board's remedial order — the bargaining order. A brief recapitulation of the events of the months following the summer of 1966 is essential to an understanding of the employer's claim. Because of the numerous unfair labor practices engaged in by the employer prior to the election scheduled for late September of 1966, the election was postponed indefinitely by order of the Board's Regional Director. Shortly thereafter the unfair labor practice complaint was filed, and on December 22, 1966, pursuant to the terms of Section 10(j), 29 U.S.C. § 160(j) (1964), the Regional Director filed a petition for a temporary injunction in the federal district court for Kansas. After a full hearing that court issued an injunction in April, 1967. Angle v. Sacks, 55 CCH Lab.Cas. ¶ 11,865 (D.Kan.1967). With slight modification that decision was affirmed by the Court of Appeals for the Tenth Circuit. 382 F.2d 655 (1967). Essentially the injunction ordered the employer to refrain from engaging in any further antiunion conduct and, pending resolution of the complaint on the merits, to reinstate four of the employees whose discharges were believed to be illegal.
 
 
 29
 The employer's argument now is that, once the Board had obtained a Section 10(j) injunction, it could not thereafter seek a bargaining order in the complaint proceeding, but was restricted to seeking a cease and desist order. The employer's rationale proceed from the premise that the purpose of an injunction in cases of this sort is to preserve the status quo pending an election, i. e., to maintain the conditions necessary to assure that the election result reflects the true, undistorted view of the employees. On the other hand, because of the strong preference for free elections, bargaining orders are appropriate only when it is demonstrated that an atmosphere conducive to the untrammeled elective process does not exist. Therefore, so the argument goes, once an injunction has been obtained the conditions essential for a valid election are assured, and the Board is precluded from asserting that such conditions do not exist.
 
 
 30
 The employer attempts to rest its case for the mutual exclusivity of injunctions and bargaining orders on the Supreme Court's recent discussion of bargaining orders in NLRB v. Gissel Packing Co., 395 U.S. 575, 610-615, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). We, contrarily, find in that opinion the refutation of so strict a limitation on the Board's expert discretion. The Court made clear that it was the Board's responsibility to ascertain on a case-by-case basis whether in fact conditions were not conducive to a "fair and reliable election." Id. at 614, 89 S.Ct. 1918. Certainly the Board may not ignore its function merely because an injunction against unfair labor practices has been obtained. Furthermore, this case would appear to provide a particularly poor vehicle for raising this novel remedial limitation since the Board did in fact find violations of Sections 8(a) (3) and 8(a) (4) after the entry of the injunction. As the Court in Gissel made clear, "a bargaining order is designed as much to remedy past election damage as it is to deter future misconduct." Id. at 612, 89 S.Ct. 1918, 1939. This being so, the scope and impact of the two remedies can rarely be expected to be coextensive.
 
 
 31
 The near converse of the employer's argument — that the pendency of a refusal to bargain complaint obviates the need for injunctive relief — was considered and rejected by the district court in the injunction proceedings in Kansas. See Sacks v. Angle, supra at 18,820-18,821. We reject its counterpart here.
 
 
 32
 We have considered the other contentions pressed by the employer in its petitions for review in Nos. 23,750 and 23,751, and find them to be without merit. Consequently we deny the review petitions of both the union and the employer, and grant the Board's application for enforcement of its orders.
 
 
 33
 It is so ordered.
 
 
 
 Notes:
 
 
 *
 Sitting by designation pursuant to Title 28, U.S.Code Section 294(c)
 
 
 [1]
 A collateral issue relevant to the first Board order is whether the Examiner erred in failing to hear the testimony of one of the employees. Although employee Garrett was not called as a witness at the initial unfair labor practice hearing, after issuance of the Examiner's Preliminary Decision the Board granted the employer's request to reopen the hearing to take his testimony. After remand to the Examiner, however, it was discovered that Garrett was suffering from serious mental and emotional difficulties and, based upon the testimony of two psychiatrists, the Examiner concluded "that Garrett was, and would continue to be, physically and emotionally unable to testify without substantial risk to his mental stability." Weighing this along with the considerations that Garrett's testimony did not appear critical and, indeed, because of his protracted emotional disturbance, would be of doubtful credibility, the Examiner recommended that the Board rescind its order requiring the reopening of the hearing. The Board complied. Since on this record we do not believe that the employer's case was seriously prejudiced, we find the Board's decision, based on the Examiner's evaluation of the matter, to be unobjectionable
 
 
 [2]
 We reserve to the third section of this opinion our examination of the several issues raised with regard to the remedies employed by the Board in this proceeding
 
 
 [3]
 NLRB v. Security Guard Serv., Inc., 384 F.2d 143, 145 (5th Cir. 1967)
 
 
 [4]
 The import of the distinction is made unmistakably clear in Section 14(a) of the Act:
 "* * * no employer subject to this Act shall be compelled to deem individuals defined herein as supervisors as employees for the purposes of any law, either national or local, relating to collective bargaining."
 29 U.S.C. § 164(a) (1964). Prior to 1947 the National Labor Relations Act appeared to treat all employees alike, drawing no lines between the rank and file employees and those more closely associated with management. The Board, however, had studiously avoided holding one way or the other on the question. When, in Packard Motor Car Co. v. NLRB, 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040 (1947), the Supreme Court dissolved all doubts by definitively holding that supervisors were employees under the Act, Congress immediately responded with the amendments (known as the Taft-Hartley Act) which, among other things, clearly defined supervisors as non-employees. See S.Rep. No. 105, 80th Cong., 1st Sess. (1947); H.R.Rep. No. 245, 80th Cong., 1st Sess. (1947).
 
 
 [5]
 One of the notices indicated that senior operators were to approve the timecards of junior operators on their shifts. The employer cites this responsibility as further evidence of their superior status. The record shows, however, that no particular significance attached to the senior operator's signature since no card was valid until the plant manager had approved it. At any rate, the function of timecard approval does not convert an employee into a supervisorSee, e. g., NLRB v. Southern Bleachery & Print Works, Inc., supra, 257 F.2d at 238.
 
 
 [6]
 See, e. g., International Union of United Brewery, Flour, Cereal, Soft Drink & Distillery Workers v. N. L. R. B., 111 U. S.App.D.C. 383, 389, 298 F.2d 297, 303 (1961), cert. denied, Gulf Bottlers, Inc. v. N. L. R. B., 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847 (1962); Local 636 of United Ass'n of Journeymen and Apprentices of Plumbing & Pipe-Fitting Industry v. NLRB, 109 U.S.App.D.C. 315, 323, 287 F.2d 354, 362 (1961).
 
 
 [7]
 The employer has also sought to make much of the established interpretation of Section 2(11) which requires that its clauses be read disjunctively,i. e., that the existence of any one of the enumerated supervisory powers is conclusive of the status question. See, e. g., NLRB v. Fullerton Publishing Co., 283 F.2d 545, 548 (9th Cir. 1960); Ohio Power Co. v. NLRB, supra 176 F.2d at 387. In its reply brief the employer characterized this interpretation as the "majority" view and alleged that the Board had in this case rejected that approach and had instead referred to the clauses of the definition as if they constituted merely a "guide" rather than a "checksheet" of pertinent indicia. In so doing it was charged by the employer with having followed the decidedly "minority" view of this jurisdiction. Food Store Employees Union, Local 347 v. NLRB, supra 137 U.S.App.D.C. at 253, 422 F.2d at 690. This contention lacks merit. The Examiner at no point purported to reject the disjunctive operation of the statute. Indeed, since he found no one of the enumerated supervisory powers to exist, he was not called on to decide whether a finding of any one of them would have been sufficient. Apart from the Board's actions, we do not read our own decisions, which seek simply to eschew a wooden application of the statute, to be inconsistent with the practice elsewhere. For a valuable discussion of the statute, rationalizing its disjunctive and conjunctive aspects, see NLRB v. Security Guard Serv., Inc., 384 F.2d 143, 147-151 (5th Cir. 1967).
 
 
 [8]
 The union was joined by the Board's General Counsel in pressing this contention upon the Trial Examiner in the first unfair labor practice hearing
 
 
 [9]
 The union contends that this case must be remanded to the Board for reconsideration in light of International Union of Electrical, Radio & Machine Workers v. NLRB, 138 U.S.App.D.C. 249, 253-259, 426 F.2d 1243, 1247-1253 (1970), cert. denied, 400 U.S. 950, 91 S.Ct. 239, 27 L.Ed.2d 256 (1971) (Tiidee Products), and UAW v. NLRB, Nos. 24,557, 24,715 (D.C.Cir. March 19, 1971) (Ex-Cell-O Corp.)Tiidee and Ex-Cell-O hold that the Board is authorized under Section 10 (c) to provide compensatory relief, over and above the customary cease-and-desist order, to make employees whole in cases characterized by the employer's brazen refusal to bargain. The unions in both cases claimed that compensation, for any period of protracted frivolous litigation designed by the employer to postpone the date on which the union would be recognized, should have been computed on the basis of an estimate of the benefits the employees would likely have derived from good faith bargaining.
 The remedy sought in this proceeding and the Board's treatment of it are sufficiently different to take this case out of the Tiidee-Ex-Cell-O context. First, while the union does claim that net back pay fails to effectuate the policies of the Act, it does not contend that the remedy has the effect of positively encouraging the employer to delay in offering reinstatement or to engage in other acts antithetical to the policies of the Act. See NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 347-348, 73 S.Ct. 287, 97 L.Ed. 377 (1953). Nor does this case raise the spectre, present in the other cases, of a Board remedy which, in effect, encourages the employer to continue his refusal to bargain, thereby frustrating a central policy of the Act favoring collective bargaining. Second, the Board was not content in this case to reject the union's remedial argument on the ground that the relief it sought was not the customary one. On this record we cannot take seriously any claim that the Board refused to exercise its discretion in arriving at an effective remedy.
 For these reasons we find it unnecessary to delay the finality of our judgment in this case in order to permit the union to petition this court for reconsideration in light of developments since this case was argued in November, 1970. See I. L. G. W. U. v. NLRB, 143 U.S.App.D.C. ___, 443 F.2d 667 (1970) (Marie Phillips, Inc.); United Steelworkers v. NLRB, 139 U.S.App.D.C. 146, 430 F.2d 519 (1970) (Quality Rubber Mfg. Co.).
 
 
 [10]
 See United Steelworkers v. NLRB, 141 U.S.App.D.C. 178, 436 F.2d 908 (1970). We also reject the union's claim that the one employee who was twice discriminatorily discharged should be given the option either to accept reinstatement, or to reject it and continue to receive back pay until he finds suitably equivalent employment elsewhere. The union's contention that employer animosity is so great that a responsible working relationship could not be re-established at this time is unpersuasive. At any rate we have not been shown that reinstatement coupled with net back pay is ineffective to effectuate the policies of the Act.