address Lavia's claim under the Rehabilitation Act.[22] *See* note 2 *supra.*

### NATIONAL LABOR RELATIONS BOARD, Petitioner in 99–5855,

v.

### PRIME ENERGY LIMITED PARTNERSHIP.

**Prime Energy Limited Partnership, Petitioner in 99–5658,**

v.

**National Labor Relations Board.**

Nos. 99–5855, 99–5658.

United States Court of Appeals, Third Circuit.

Argued June 19, 2000.

Filed Aug. 9, 2000.

Maurice J. Nelligan, Jr., (Argued), John P. Harrington, Apruzzese, McDermott, Mastro & Murphy, Liberty Corner, NJ, for Prime Energy Limited Partnership.

Robert J. Englehart, (Argued), Peter Winkler, Supervisory Attorney, Leonard R. Page, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, National Labor Relations Board Washington, DC, for National Labor Relations Board.

Before GREENBERG and WEIS, Circuit Judges, and SCHWARTZ,* District Judge.

* The Honorable Murray M. Schwartz, Senior United States District Court Judge for the District of Delaware, sitting by designation.

## OPINION OF THE COURT

WEIS, Circuit Judge.

In this appeal, we review a decision of the National Labor Relations Board that seven workers were not supervisors under the National Labor Relations Act. Because the record shows the purported supervisors employed independent judgment in assigning tasks to their subordinates and in exercising disciplinary authority, we conclude that the Board's decision is not supported by substantial evidence. Accordingly, we will grant the Petition for Review and deny the Board's Cross–Application to Enforce.

Prime Energy Limited Partnership operates a power co-generation plant in Elmwood Park, New Jersey that supplies steam and electricity to three nearby paper mills operated by Marcal Paper Mills, Inc. Surplus electricity is sold to Jersey Central Power & Light Company.

Completed in 1989, the plant was built for the specific purpose of supplying Marcal with its energy needs. Both the mill and the plant operate twenty-four hours a day, and any disruption in the steam or electricity supply will cause mill operations to halt abruptly. Shut-downs are extremely costly because of lost production time and possible equipment damage.

The plant requires only eighteen people to maintain this continuous operation. Plant personnel are organized into the following positions: Plant Manager, Assistant Plant Manager, Administrative Assistant, Senior Mechanical Maintenance Supervisor, Senior Electrical Maintenance Supervisor, five Shift Supervisors, five Plant Operators, an electrician, and two mechanical maintenance employees.

The Plant Operators migrated from the paper mill to the co-generation plant when operations began, and continue to be represented by the United Paperworkers International Union. In October 1998, the International Union of Operating Engineers sought to organize ten of the company's non-union employees: the Shift Supervisors, the Senior Mechanical Maintenance Supervisor, the Senior Electrical Maintenance Supervisor, the mechanical maintenance workers, and the electrician. The company contended that of these positions, those with the title of "supervisor" actually were supervisory employees and excluded from coverage under the National Labor Relations Act. The company proposed simply adding the remaining three employees to the existing bargaining unit.

The NLRB regional director disagreed with the company's position and authorized a balloting of the ten employees to decide whether to organize. The union won the election.

The company refused to bargain with the union, and in due course, the matter came before an NLRB panel. By a 2–to–1 vote, the Board found the refusal to bargain to be an unfair labor practice by the company and directed Prime Energy to bargain. The company filed a Petition for Review bringing the case before this Court; the Board filed a Cross–Application for Enforcement of its order.

■ We have jurisdiction to consider the Petition for Review and the Board's Cross–Application pursuant to 29 U.S.C. § 160(e) and (f). In our inquiry, we look to the record to determine whether substantial evidence supports the Board's findings of fact. *NLRB v. Attleboro Assoc., Ltd.*, 176 F.3d 154, 160 (3d Cir.1999). On questions of law, we exercise plenary review, and our own jurisprudence dictates our decision. *Passavant Retirement & Health Ctr. v. NLRB*, 149 F.3d 243, 246, 249 (3d Cir.1998).

The issue presented is whether the seven contested employees are within the category of supervisors in section 2(11) of the National Labor Relations Act. The Act defines a "supervisor" as:

[A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline

other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11).

Experience has demonstrated and the Supreme Court has acknowledged that a straightforward application of the text to the spectrum of real-world job descriptions sometimes creates tensions. *NLRB v. Health Care & Retirement Corp. of America*, 511 U.S. 571, 581, 114 S.Ct. 1778, 128 L.Ed.2d 586 (1994) (*citing NLRB v. Yeshiva Univ.*, 444 U.S. 672, 686, 100 S.Ct. 856, 63 L.Ed.2d 115 (1980)). As the NLRB has evaluated and categorized various jobs in the economy, courts have noted the Board's failure to arrive at a reasonably consistent view of the statutory definition of supervisor. *See, e.g., Spentonbush/Red Star Cos. v. NLRB*, 106 F.3d 484, 492 (2d Cir.1997).

In this Court, we have recently considered the question of supervisory status in the context of licensed practical nurses employed by health care institutions. *See NLRB v. Attleboro Assoc., Ltd.*, 176 F.3d 154 (3d Cir.1999); *Passavant Retirement & Health Ctr. v. NLRB*, 149 F.3d 243 (3d Cir.1998). The so-called "charge nurse cases" demonstrate the difficulty of determining supervisory status and the several Courts of Appeals to consider the question differ in the results they have reached.[1]

In *Attleboro*, we held that a charge nurse with the authority to counsel other employees directly, as well as the discretion to initiate a disciplinary process documented in a personnel file that could lead to termination, performed one of the statutory supervisory activities. *Attleboro*, 176 F.3d at 165. Doing so is an exercise of independent judgment. *Id.* In *Passavant*, we held that a charge nurse's authority to send a person home from work is disciplinary in nature and indicative of supervisory status. *Passavant*, 149 F.3d at 248.

The Supreme Court's contribution to this issue has so far been limited to considering a narrow, parallel question over application of the definition in section 2(11). *Health Care & Retirement*, 511 U.S. at 577–80, 583, 114 S.Ct. 1778. There, the Court held that the decision of a charge nurse about a patient's health was "in the interest of the employer," the final requirement in the definition of supervisor. *Id.* at 580, 114 S.Ct. 1778.

▮ Although the charge nurse cases are factually different than the one presently before us, *Health Care & Retirement*, *Attleboro*, and *Passavant* provide the framework that governs the construction of section 2(11) within this circuit. We do not consider the ratio of supervisors to employees when determining the supervisory status of a position, and we give equal weight to each of the twelve categories within the statutory definition. *Attleboro*, 176 F.3d at 163 n. 5. Moreover, the three questions outlined in *Health Care & Retirement* must be answered: (1) "does the employee have authority to engage in 1 of the 12 listed activities?" (2) "does the exercise of that authority require' the use of independent judgment'?" and (3) "does the employee hold the authority 'in the interest of the employer'?" *Health Care & Retirement*, 511 U.S. at 574, 114 S.Ct. 1778.

---

1. *Compare NLRB v. Attleboro Assoc., Ltd.*, 176 F.3d 154, 165 (3d Cir.1999) (concluding that charge nurses were supervisors), *Beverly Enters., W. Va., Inc. v. NLRB*, 165 F.3d 307, 309 (4th Cir.1999) (en banc) (same), *and Caremore, Inc. v. NLRB*, 129 F.3d 365, 366–67 (6th Cir.1997) (same), *with Beverly Enters.—Mass., Inc. v. NLRB*, 165 F.3d 960, 964 (D.C.Cir.1999) (concluding that charge nurses were not supervisors), *NLRB v. Hilliard Development Corp.*, 187 F.3d 133, 147–48 (1st Cir. 1999) (same), *NLRB v. GranCare, Inc.*, 170 F.3d 662, 668 (7th Cir.1999) (en banc) (same), *Beverly Enters. v. NLRB*, 148 F.3d 1042, 1048 (8th Cir.1998) (same), *and Providence Alaska Medical Ctr. v. NLRB*, 121 F.3d 548, 555 (9th Cir.1997) (same).

## I.

### The Shift Supervisors

■ The co-generation plant combines electrical, mechanical, chemical, hydronic, steam, oil, and natural gas systems in order to produce electricity and steam. The nerve center is the plant's control room. There, a Shift Supervisor monitors and directs operation of the plant.

The Plant Operators work on the plant floor. They constantly patrol the plant, logging temperature and pressure measurements, checking oil levels, and listening to the equipment for signs of a malfunction. They communicate with the Shift Supervisor by radio, investigating problems, verifying control room instrument readings, and receiving instructions about their tasks.

During the night and on weekends, one Shift Supervisor and one Plant Operator are on duty. During the weekday daylight shift, one additional Shift Supervisor and one Plant Operator are present in the plant as a "work week" detail, doing general maintenance and completing sundry projects. A Shift Supervisor's responsibilities include assigning certain daily tasks to the Plant Operator. Because of differences in the shift schedule rotations, a Shift Supervisor will not always work with the same Plant Operator.

The Shift Supervisor is responsible for the safe operation of the facility. In the event that an emergency occurs, he is empowered to make important and often critical decisions necessary to stabilize the plant. He then notifies the Plant Manager or Assistant Plant Manager.

John Griffin, a Shift Supervisor and Board witness, testified that he can tell an operator to stop one job and move to a more pressing task. He can also direct the Plant Operators to adjust various components and so regulate operations of the plant.

If a Plant Operator does not perform a job properly, the Shift Supervisor prepares an incident report and forwards it to the Assistant Manager. Griffin was aware of one incident when an operator named Stapleton refused to follow an order of a Shift Supervisor. The company produced documentation showing that when Stapleton refused to complete an assignment, the Shift Supervisor sent him home and reassigned another Plant Operator to complete the task. Following an investigation, Stapleton was discharged because of insubordination and insolence.

The testimony indicated that although Shift Supervisors do not arrange scheduled overtime, they can hold Plant Operators over at the end of a shift. If the next shift's personnel failed to arrive, if there was a project that needed to be completed, or if they needed someone to stay and clean, Griffin believed it was within his power to authorize such overtime.

Shift Supervisors and Plant Operators differ significantly in compensation. The Shift Supervisors are paid on average 15% more per hour. Only Shift Supervisors are eligible for bonus pay, and they receive more advantageous insurance coverage. Plant Operators do not accumulate sick days from year to year, but Shift Supervisors do.

Despite this evidence, the regional director's report asserted that Shift Supervisors are not supervisory. This conclusion is based on findings which are contrary to the record. For example, the regional director stated that Shift Supervisors do not possess the authority to discipline a Plant Operator.

The mere fact that the regional director found only one instance where a Shift Supervisor sent a Plant Operator home is hardly a reasonable basis to conclude that the authority was lacking. It simply suggests that the authority was rarely needed. "[O]nce the existence of supervisory authority is established, the degree or frequency of its exercise is of little consequence." *Oil, Chemical and Atomic Workers Int'l Union v. NLRB*, 445 F.2d 237, 244 (D.C.Cir.1971). Furthermore, as

we said in *Warner Co. v. NLRB*, 365 F.2d 435, 439 (3d Cir.1966), "[i]t can scarcely be denied that sending a man home is discipline or that it does require the use of independent judgment." In *Warner*, we concluded that this authority, together with the power to adjust grievances, fell within the ambit of section 2(11). *Id.* at 438–39; *see also Passavant*, 149 F.3d at 248.

The regional director also misconstrued the record with respect to the Shift Supervisor's authority in operating the plant. Griffin did indicate that the Shift Supervisor must contact the Plant Manager when emergencies occur. The director failed to note Griffin's further testimony that the Shift Supervisor would notify his superior only after he took the necessary steps to place the plant in a safe condition. The logical conclusion, therefore, is that those in the position of Shift Supervisor had the authority to assess the severity of the problem and take appropriate measures. *Cf. Oil, Chemical and Atomic Workers*, 445 F.2d at 242.

The regional director dismissed evidence of Shift Supervisors assigning jobs to Plant Operators, finding the assignments were "pursuant to a routine and pre-determined priority classification." We reject this reading of the evidence. In our view, the record shows that Shift Supervisors weighed the relative urgency of immediate and unforeseen problems and directed Plant Operators to undertake necessary tasks. In so doing, they are performing a section 2(11) activity with independent judgment and without the guidance of routine.

The regional director also noted as significant Griffin's statement that he does not authorize overtime. That finding, however, is contrary to his subsequent testimony clarifying the question. There, Griffin acknowledged that he did authorize unscheduled overtime. The director also mischaracterized Griffin's testimony that he received the same benefits as other employees. Actually, he testified he did not know the difference in pay between his position and the people under him. Elsewhere, the record clearly establishes the differences in compensation.

Finally, the director supported his conclusion by noting the low ratios of Shift Supervisors to Plant Operators. We give no weight to this factor in determining the supervisory status of an employee. *Attleboro*, 176 F.3d at 163 n. 5.

The record in this case establishes that Shift Supervisors assign various tasks to Plant Operators, have the authority to discipline Plant Operators and have done so, and must exercise responsibility in directing the work of the Plant Operators, particularly in the event of an emergency. These tasks are neither clerical in nature nor routine. We conclude that the Shift Supervisors do have the authority to engage in at least one of the twelve activities in section 2(11). In addition, proper exercise of these functions requires the use of independent judgment. Finally and quite obviously, this authority is exercised in the interest of the employer. Based as it is on the report of the regional director, the Board's decision that the Shift Supervisor positions are not supervisory is not supported by substantial evidence.

## II.

### *Senior Mechanical and Electrical Maintenance Supervisors*

■ We turn next to the Senior Mechanical Maintenance Supervisor and Senior Electrical Maintenance Supervisor categories. They are parallel positions heading the mechanical maintenance group and the electrical maintenance group. For the purposes of this proceeding, the company and the Board viewed the jobs as essentially indistinguishable, and we have found no relevant evidence differentiating the two. Like the Board, therefore, we will treat them as similar.[2]

2. The position of Senior Electrical Mainte-

nance Supervisor was vacant at the time of

The Senior Mechanical Maintenance Supervisor position was held by George Murphy at the time of the hearing. Two employees regularly report to him, as does the Plant Operator on "work week" detail. He also oversees outside contract employees who periodically work in the plant. Murphy is paid on an hourly basis, but at a higher rate than the other maintenance mechanics.

Murphy had substantial influence in the hiring decision to fill the most recent vacancy in his group. The employee eventually hired was selected from a panel of thirty-five applicants. Murphy and the Plant Manager narrowed the group to six. Both conducted telephone interviews, then invited four candidates to have in-person interviews. After discussion between Murphy and the Plant Manager, one candidate was selected. The Plant Manager testified this decision was based 90 percent on Murphy's recommendation.

Murphy reports to the Plant Manager. Based on a daily meeting with all those in management, Murphy assigns work to the maintenance employees who report to him. He decides who will perform a task, usually designating from one to three persons for each. These assignments are not routine, but vary from day to day. Murphy includes himself in the tasks, sometimes working alongside the others.

Murphy is given considerable responsibility in overseeing the maintenance of his equipment. In an emergency, he is authorized to purchase parts for repairs, pledging the company's credit in payment. When major maintenance work lasting a number of days is necessary, additional personnel are assigned to work for Murphy. On a number of occasions, it has been necessary to hire outside contractors. Murphy prepares specifications for such jobs and oversees the contractors when they perform the work. He also coordi-

nates with the Shift Supervisors to determine what areas of the plant should be taken out of service during the period of the maintenance work.

As with the Shift Supervisors, the regional director concluded the two Senior Maintenance Supervisors did not possess supervisory status. The regional director diminished the significance of Murphy's role in hiring employees. Acknowledging that the Plant Manager "relied heavily on Murphy's recommendation" for one particular hiring, the report asserted that "[i]t is important to note however that Thomas Heck, maintenance mechanic welder, testified that when he was hired in July, 1997, he was not interviewed by Murphy, but rather dealt directly with [the] former plant manager."

This observation is misleading, however, because Murphy was already quite familiar with Heck—he had worked in the plant as an independent contractor for several years in the past, taking direction directly from Murphy. In those circumstances, an interview by Murphy would have been unnecessary and actually only a formality. Although the record does not indicate whether the Plant Manager at the time consulted with Murphy regarding Heck's employment, the absence of an interview by Murphy is irrelevant.

The regional director concluded that the Plant Manager or Assistant Plant Manager is responsible for assigning tasks to those in the maintenance groups, and that the Senior Maintenance Supervisors' roles are routine. This does not fit with the testimony of the Plant Manager, who indicated that the Senior Maintenance Supervisors "dictate who will perform [the] work" and "which jobs are priority." Nor does it match the testimony of Thomas Heck, who reports to Murphy, acknowledging that it was Murphy who directed the maintenance employees as to what jobs to do.

the Board hearing and the job was performed by an electrical maintenance mechanic. The company does not contend that this individual is a supervisor. To determine the supervisory

status of the *position*, however, we will look to the findings regarding the Senior Mechanical Maintenance Supervisor.

At the conclusion of his analysis, the regional director noted that were he to reach a different result, his decision "would create a ratio of supervisors to unit employers ... which is unrealistic." We reject such a simplistic approach for the Procrustean bed it is—an ill-conceived attempt to fit all comers into one analytic framework. New facilities such as this, where the implementation of technology alters the labor landscape, require flexibility. A mere ratio by itself, then, cannot be determinative.

When the duties of the Maintenance Supervisor are evaluated, they clearly include assignment of work and the responsible direction of employees, activities listed in section 2(11). Contrary to the decision of the Board, there is not substantial evidence in the record to conclude that these activities are either clerical or routine. Rather, we find that the only fair reading of the record shows that when the Senior Maintenance Supervisors engage in the listed activities, they exercise independent judgment, and act in the interest of the employer.

Accordingly, we will grant the company's Petition for Review, reverse the Board's Order, and deny the Board's Cross–Application to Enforce.