NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SUPREME DYEING & FINISHING
CORP. et al., Respondents.

No. 6400.

United States Court of Appeals
First Circuit.

Heard Jan. 4, 1965.

Decided Jan. 27, 1965.

Stephen B. Goldberg, Washington, D. C., Atty., with whom Arnold Ordman,

Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, were on brief, for petitioner.

Leo M. Goldberg, Providence, R. I., with whom Philip B. Goldberg, Haig Barsamian, Sayles Gorham, and Goldberg & Goldberg, Providence, R. I., were on briefs, for respondents.

Before ALDRICH, Chief Judge, and SWEENEY and WYZANSKI, District Judges.

ALDRICH, Chief Judge.

█ In opposition to this petition for enforcement of an order of the National Labor Relations Board respondents seek to raise essentially three evidentiary questions. Respondents are Valley Maid Co., Inc., and Supreme Dyeing and Finishing Corp., two Rhode Island corporations engaged, respectively, in the manufacturing and finishing of lace products. One Matteson, treasurer of both companies, manages and controls all their affairs, including labor policy. He and his family own all of the Valley stock, and a majority of the Supreme stock. Valley has six employees. Supreme, which does the finishing work for Valley and some fifty other companies, has thirty to forty employees. Both companies conduct their business in the same building and their employees share certain common facilities. They do not do the same work, and there is no interchange of employment.

One St. Germaine was a leadman employed by Valley; Brodeur and DiChristofaro were leadmen employed by Supreme. The Board found them to be supervisors for whose conduct their employers were responsible. No useful purpose would be served by reviewing the Board's subsidiary findings. We note, however, the unlikely circumstance that if these men were not supervisors, Matteson would have been the sole supervisor of both companies. We have no disposition to disturb the Board's finding. NLRB v. Swift & Co., 1 Cir., 1961, 292 F.2d 561.

In July 1963 a union known as the Levers Section sought recognition from Matteson as the representative of the employees of Valley. This was refused. On July 12 St. Germaine held a meeting by all but one of Valley's employees. Also present were two or three employees of Supreme. The meeting was addressed by a representative of the Textile Workers Union (TWUA), who left with St. Germaine fifty authorization cards, obviously aiming at the employees of both companies. St. Germaine gave a number of these cards to Brodeur, who in turn gave some of them to DiChristofaro who obtained some signatures and returned the cards to St. Germaine.

On July 15 Levers Section Union established a picket line. No employees of Valley went on strike, but a number of Supreme's employees, including one Tivey, held a meeting and refused to cross the line. The Board found that because these employees acted jointly and had grievances, although they did not express them to the employer, they were on an economic strike. The propriety of this finding is unimportant.[1] On July 16 Brodeur and his wife called on Tivey and sought to persuade her to execute a TWUA card, saying it was "the only way out, that Mr. Matteson said if we signed the cards and put them in the mail, the sooner the better, everybody would get back to work." The Brodeurs likewise called on another employee of Supreme and told her, "[T]he sooner we signed the card and mailed it the sooner we would get back to work." Word of this approach was communicated to the other disaffected employees of Supreme, who agreed that they should join a union of their own choice. Those who had stayed out, continued to stay out. Thereafter they were replaced. Subsequently they sought to return to work but were refused. A charge was then filed by

1. It is of even less significance that the Rhode Island Department of Employment Security found that these employees had left their work without good cause. At most this was merely contradictory evidence disbelieved by the Board.

Levers Auxiliary Section, a union affiliated with the Levers Section union, and the appropriate union for Supreme's, as distinguished from Valley's, employees.

The Board found that for the purpose of the Act Valley and Supreme were a single employer. This conclusion was warranted. We note particularly that even if it could be said that Matteson, as treasurer and manager of each company, wore two separate hats, St. Germaine, the supervisor who initially sought to advance management's interest in TWUA as the desirable union for Supreme's employees, was an employee of Valley. In the light of this joint labor activity Valley's cases of J. G. Roy & Sons Company v. NLRB, 1 Cir., 1958, 251 F.2d 771, and Bachman Machine Company v. NLRB, 8 Cir., 1959, 266 F.2d 599 are distinguishable. The facts are more like Majestic Molded Products, Inc. v. NLRB, 2 Cir., 1964, 330 F.2d 603.

Nor was there error in the Board's concluding that Brodeur, on the respondents' behalf, committed an unfair labor practice on July 16. It is one thing for an employer to state which union it would prefer. NLRB v. Corning Glass Works, 1 Cir., 1953, 204 F.2d 422. *It is quite another matter to accent the endorsement with a statement of consequences.*[2] An employee could well conclude from Brodeur's remarks about selecting TWUA as "the only way" by which resumption of work would be "sooner," that any other choice would mean very much "later." This was not free speech, but discrimination or coercion. *National Labor Relations Board v. Virginia Electric & Power Co.*, 1941, 314 U.S. 469, 477, 62 S.Ct. 344, 86 L.Ed. 348; National Labor Relations Board v. Cabot Carbon Co., 1959, 360 U.S. 203, 218, 79 S.Ct. 1015, 3 L.Ed.2d 1175.

Since we agree with the Board that after July 16 Supreme's abstaining em-

ployees were on strike because of an unfair labor practice, they were entitled to be rehired. Mastro Plastics Corp. v. National Labor Relations Board, 1956, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309. It follows that the Board's order, based upon violation of sections 8(a) (2) and (1) and sections 8(a) (3) and (1) of the Act by both respondents, must be enforced.

2. A good case has been made for the proposition that even a threat of consequences may backfire, and benefit the disfavored union. See Bok, The Regulation of Campaign Tactics in Representation Elections, 78 Harv.L.Rev. 38, 41, 72 (1964). Nonetheless we, of course, cannot assume that this will be so.