**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SECURITY GUARD SERVICE, INC., Respondent.**

No. 23894.

United States Court of Appeals
Fifth Circuit.

Sept. 25, 1967.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Marsha Swiss, Atty., N. L. R. B., Washington, D. C., Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Elliott Moore, Attorney, N. L. R. B., for petitioner.

W. A. Thurmond, Charles R. Jones, Scott, Hulse, Marshall & Feuille, El Paso, Tex., for respondent.

Before RIVES, WISDOM, GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge.

We have here for decision the aging but nevertheless persistently vexing problem of whether or not an employee is a supervisor. The National Labor Relations Board seeks the enforcement of its order pursuant to Section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160(e), against Security Guard Service, Inc. (Security). The Board adopted the Trial Examiner's findings that the company had violated Section 8(a) (1) and (3) of the Act by interfering with its employees' rights of self-organization in discharging Guard Sergeant Paul R. Ashmore because of his activity on behalf of the union. 154 NLRB 8.

Ashmore's status is the sole and determinative issue of this case.[1] Security claims that he is a supervisor, and thus not protected under the Act from discriminatory discharge. The Board insists that his statutory status is one of "employee" rather than "supervisor." We enforce.

Security, a Texas corporation with its principal office and place of business in El Paso, Texas, provides guard security services and related services in Texas and New Mexico. In the spring of 1964 an organizational movement began among the company's guard employees. On May 6, 1964, a week before the employees' representative filed a petition for a Board election, Security discharged Ashmore, admittedly because of his participation in union activities.

Ashmore had been employed as a guard sergeant at the National Aeronautics and Space Administration's (NASA) White Sands Missile Site near Organ, New Mexico. The guard complement at the site consisted of one captain, four guard sergeants, and six or seven guards. The guard sergeants and guards worked in three shifts continuously on a 24-hour basis. Generally, in addition to one guard sergeant, three guards were on duty during the early shift, one or two guards during the second shift, and one guard during the third shift. The captain, an admitted supervisor, was generally on duty throughout the day shift and remained until about 4:30 p. m., an hour and a half into the second shift. The guards spent the majority of their time at the guardhouse at the main gate checking all vehicles and persons entering or leaving the site. They also patrolled the tech area and the site perimeter. NASA issued badges to people authorized to enter, and there was a list of those entitled to enter which was maintained and which was checked by the guards. Sergeants performed the same patrol and guard functions as the other guards but additionally maintained a daily activity log on a NASA form and kept time cards of the guards assigned to

---

1. Early in the trial examiner's hearing Security's counsel limited the issue to Ashmore's supervisory capacity, admitting all other allegations in the complaint.

their shift. These sergeants generally related and interpreted instructions from the captain to other guards on the shifts and occasionally made decisions on admittance of personnel. Shift assignments were made by the captain. The sergeants, like the other guards, were paid by the hour and received overtime pay, although the hourly rate of pay was approximately 25 percent higher than the rate paid the others. The captain was paid monthly and received approximately 50 percent more than the sergeants but was not compensated for any overtime work. The uniforms of the captain and the sergeants were the same but were different from the guards in that the sergeants and captains wore white cap covers and gold badges.

■ The iteration of the thesis that the Board's findings are not to be considered fragile or frangible is constantly and unremittingly before us. The tensile strength of such findings increases as they are applied to the minutiae of management-employee relations. NLRB v. Erie Resistor Corp., 1963, 373 U.S. 221, 236, 83 S.Ct. 1139, 10 L.Ed.2d 308, 94 A.L.R.2d 1137. Concerning the determination of "supervisor" status, we subscribe to the following well-received statement:

> [T]he gradations of authority 'responsibly to direct' the work of others from that of general manager or other top executive to 'straw boss' are so infinite and subtle that of necessity a large measure of informed discretion is involved in the exercise by the Board of its primary function to determine those who as a practical matter fall within the statutory definition of a 'supervisor.'

NLRB v. Swift and Co., 1 Cir. 1961, 292 F.2d 561, 563, quoted with approval in Marine Engineers Beneficial Ass'n v. Interlake Steamship Co., 1962, 370 U.S. 173, 179 n. 6, 82 S.Ct. 1237, 8 L.Ed.2d 418 and in NLRB v. Bama Co., 5 Cir. 1965, 353 F.2d 320, 322. Judge Hutcheson's recent opinion in Trailmobile Division,

Pullman, Inc. v. NLRB, 5 Cir. 1967, 379 F.2d 419, 422, likewise accords the Board "considerable discretion." Finally, in Local No. 207, Intern. Ass'n of Bridge Structural and Ornamental Iron Workers Union v. Perko, 1963, 373 U.S. 701, 706, 83 S.Ct. 1429, 10 L.Ed.2d 646, the Supreme Court not only recognized Board pre-emption in a case involving dismissal of a foreman but also expressed respect for the Board's decision in "difficult problems of status."

■ We are aware that despite such judicial deference to Board expertise, we must reverse the Board if the record does not contain substantial evidence to support its holding. Universal Camera Corp. v. NLRB, 1951, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. In fact, this Court has recently denied enforcement of two Board orders after careful analyses of the Universal Camera doctrine. NLRB v. O. A. Fuller Super Markets, Inc., 5 Cir. 1967, 374 F.2d 197, 200; NLRB v. Whitfield Pickle Co., 5 Cir. 1967, 374 F.2d 576, 581–582. An examination of the record discloses substantial evidence, however, that Ashmore was not in the category of employee designated by Congress as "supervisor."

■ Section 2(3) of the National Labor Relations Act expressly excludes supervisors from employee status.[2] Section 2(11) of the Act defines "supervisor" in the following manner:

> The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

To be sure, the enumerated functions of a supervisor are listed disjunctively. NLRB v. Elliott-Williams Co., 7 Cir.

---

2. "The term 'employee' * * * shall not include * * * any individual employed as a supervisor * * *." 29 U.S.C.A. § 152(3).

1965, 345 F.2d 460 (1965); Ohio Power Co. v. NLRB, 6 Cir. 1949, 176 F.2d 385, 387, 11 A.L.R.2d 243, cert. denied, 1949, 338 U.S. 899, 70 S.Ct. 249, 94 L.Ed. 553; NLRB v. Edward G. Budd Mfg. Co., 6 Cir. 1948, 169 F.2d 571, 576, cert. denied sub nom. Foremen's Ass'n of America v. Edward G. Budd Mfg. Co., 1949, 335 U.S. 908, 69 S.Ct. 411, 93 L.Ed. 441. Nevertheless, the statute expressly insists that a supervisor 1) have authority 2) to use independent judgment 3) in performing such supervisory functions 4) in the interest of management. These latter requirements are conjunctive. See International Union of United Brewery, etc., v. NLRB, 1961, 111 U.S.App.D.C. 383, 298 F.2d 297, 303, cert. denied, 1961 sub nom. Gulf Bottlers, Inc. v. NLRB, 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847; Poultry Enterprises v. NLRB, 5 Cir. 1954, 216 F.2d 798, 802; NLRB v. Brown & Sharpe Mfg. Co., 1 Cir. 1948, 169 F.2d 331, 334. Moreover, the statutory words "responsibility to direct" are not weak or jejune but import active vigor and potential vitality.

■■ In 1947 Congress, by enacting Sections 2(3) and 2(11), expressly shielded companies from the possible organization of "all who are on the payroll of the company, including the president".[3] That the exclusion from "employee" status applied only to foremen who were "the arms and legs of management in executing labor policies"[4] is evident, however, from the following excerpt from the Senate Committee Report:

[T]he committee has not been unmindful of the fact that certain employees with minor supervisory duties have problems which may justify their inclusion in the act. It has therefore distinguished between straw bosses, leadmen, set-up men, and other minor

supervisory employees, on the one hand, and the supervisor vested with such genuine management prerogatives as to the right to hire or fire, discipline, or make effective recommendations with respect to such action.

S.Rep. No. 105, 80th Cong., 1st Sess. 4 (1947). The Conference Committee which reconciled House and Senate bills reported:

Supervisors.—As heretofore stated, both the House bill and the Senate Amendment excluded supervisors from the individuals who are to be considered employees for the purposes of the act. The House bill defined as 'supervisors', however certain categories of employees who were not treated as supervisors under the Senate amendment.

\*   \*   \*   \*   \*   \*

The conference agreement, in the definition of 'supervisor,' limits such term to those individuals treated as supervisors under the Senate amendment. \*   \*   \*

H.Rep. No. 510, 80 Cong. 1st Sess. 35 (1947), U.S.Code Cong. Service 1141 (1947). Clearly Section 2(3) created and Section 2(11) defined an exception carved out of a general provision. The above legislative history justifies the standard reluctance to apply an exception broadly.

Recognizing different judicial tendencies in the Section's application, we tend to agree with the analysis in International Union of United Brewery, etc. v. NLRB, 1961, 111 U.S.App.D.C. 383, 298 F.2d 297, 303, cert. denied, 1961 sub nom. Gulf Bottlers, Inc. v. NLRB, 369 U.S. 843, 82 S.Ct. 875, 7 L.Ed.2d 847:

This court early saw in section 2(11) an unmistakable congressional purpose to deny the benefits of the Act to 'supervisors.' It was intended that

---

3. Douglas, J., dissenting in Packard Motor Co. v. NLRB, 1947 (before passage of the Taft-Hartley Act), 330 U.S. 485, 494, 67 S.Ct. 789, 91 L.Ed. 1040. The Court's opinion prompted passage of Sections 2(3) and 2(11). See excerpts of congressional history quoted in L. A.

Young Spring Wire Corp. v. NLRB, 1947 (after passage of the Taft-Hartley Act), 82 U.S.App.D.C. 327, 163 F.2d 905, 906–907.

4. Douglas, J., dissenting in Packard Motor Co. v. NLRB, supra, 330 U.S. at 496, 67 S.Ct. at 795.

the employer be given 'a free hand to discharge foremen as a means of ensuring their undivided loyalty, in spite of any union obligations,' we said in other context.

It has seemed to us that if a mere employee at some stage may become a supervisor, the transition becomes an actuality when he is found to possess real power 'in the interest of the employer' to take meaningful action with respect to the statutory tests. It is not alone that he may hire or fire or lay off or discipline. He must do so in the interest of the employer. He must then, when acting, become in effect a part of management, not simply a lead man or straw boss. The entire work force from the president down to the messenger boy in one sense acts in the interest of the employer, as Congress well knew. Surely it contemplated some other test than is afforded by a sheerly literal reading of section 2(11).

We recently spelled out various criteria to be applied by the Board in an individual, case-by-case approach. We had in mind particularly that there must be a determination of status based upon the 'nature' of the supervisory position and 'how completely the responsibilities of the particular position identify the holder of the position with management,' all 'because of the infinite possible variations in responsibilities enumerated in § 2(11).'

In the present case substantial evidence shows that the sergeant's basic work was identical to the work of the guard. There were times when either would be alone. The flow of orders, decisions, and discre-

tion was from the captain or NASA. All unusual matters or incidents were referred to higher echelons. Occasionally Ashmore admitted persons without badges. Not only were these admissions occasional, but there was no showing that an ordinary guard could not make this same type of judgment.[5] These were acts of discretion common to the job of guard, and the Board was justified in finding that they were not acts of discretion in directing employees.

To prove this latter discretion, Security points to the act of a sergeant in suspending a guard, an event of small consequence which occurred five months after Ashmore's discharge. The controlling fact is that the sergeant reported the situation to the captain who in reality decided to suspend the guard. This was not supervision by the sergeant; it was advising and awaiting decision from others.[6]

In support of Ashmore's employee status, much is made of his alleged adjustment of grievances because of a specific recommendation regarding a trailer heater. He merely made a recommendation which management considered in the evaluating process of determination.

Security further armors its pro-supervisory argument by pointing to several company documents supposedly conferring supervisory authority on Ashmore. The Company's contract with NASA provided in part:

A competent supervisor shall be on duty and shall be in charge of each security guard force shift at all times. Shift supervisors shall be individuals who have demonstrated supervisory

---

5. When unusual admittance questions came up or when pickets were on the scene, Ashmore notified NASA and was given instructions. The admittance of wives of a contractor official was not a summit decision and was the subject of a report by Ashmore. The next day he sought permission for the son of a badge holder to enter.

6. The sergeant in question was Edward Kosprovski. Three other guard sergeants appeared as witnesses before the trial

examiner. Ashmore stated that he had never had occasion to hire, discharge, reprimand, or report misconduct of a guard. George E. Wagoner, in testimony discredited by the trial examiner, testified that he 'had the authority to direct the guard in his work,' but he stated no example of such authority. Eugene Paul Brown, on the other hand, testified that he reported a guard for disobeying an order and, to his knowledge, nothing was done about it.

ability by successful experience of at least one year in a position similar to the position contemplated. The supervisor shall be available at all times to receive and implement directives issued by the government.

The Company's own "General Practice Procedures" manual stated under a paragraph headed "Organization":

The security force shall be divided into four shifts, each shift headed by a Sergeant who shall be in charge of all security activities on his particular shift, plus such other miscellaneous operations as may be assigned to him. It shall be his responsibility to assign the security guard his individual duties each shift and to interpret all rules and regulations pertaining to their work and for the performance of their duties.

Under "Employee Discipline" the same manual stated:

Violation of any one or more of the following rules is sufficient reason for immediate suspension by the supervisor.

■ Concerning the contract with NASA, supervision which is commercially contracted for is not necessarily the same supervision envisioned by Section 2(11) of the Act. Moreover, what is amiss with this argument which is based on paper credentials is that there is lack of actual authority to match. The concept of supervision has some elasticity, but it must have substance and not be evanescent. Statutory supervision requires some suiting of the action to the words and the words to the action. The supervision must have both conceptual and practical aspects and must be meaningful in respect to the position occupied by the employee. Implemented intentions are integers in the formula. A supervisor may have potential powers, but theoretical or paper power will not suffice. Tables of organization and job descriptions do not vest powers. Some kinship to management, some empathic relationship between employer and employee, must exist before the latter becomes a supervisor for the former. See NLRB v. Griggs Equipment, Inc., 5 Cir. 1962, 307 F.2d 275, 279, quoting NLRB v. Southern Bleachery & Print Works, Inc., 4 Cir. 1958, 257 F.2d 235, 239, cert. denied 1959, 359 U.S. 911, 79 S.Ct. 588, 3 L.Ed.2d 575. Cf. NLRB v. Capital Transit Co., 1955, 95 U.S.App.D.C. 310, 221 F.2d 864, 867.

The Board was justified in holding that Ashmore was at most a lead man, unidentified with management. He did not hire, fire, or discipline; he recommended and reported. The work assignments which are alleged to be supervisorial were as transitory as they were routine. And to point to one act as supervisorial is pertinent and relevant but is not irrefutable. Nearly every employee at some time, under certain conditions, tells someone else what to do. A supervisor may be vested with plenary power and rarely exercise it, but one who engages in an isolated incident of supervision is not necessarily a supervisor under the Act. If this were the criterion and the hallmark of supervision, then practically all employees would be supervisors. This Congress did not intend.

The Seventh Circuit, in a case involving a similar work situation, upheld the Board's decision that a sergeant was not a supervisor in the meaning of Section 2(11) of the Act. NLRB v. Merchants Police, Inc., 7 Cir. 1963, 313 F.2d 310, 312. Other cases have likewise relegated lead men and "straw bosses" to employee status. NLRB v. City Yellow Cab Company, 6 Cir. 1965, 344 F.2d 575; NLRB v. Griggs Equipment, Inc., 5 Cir. 1962, 307 F.2d 275; Northern Virginia Steel Corp. v. NLRB, 4 Cir. 1962, 300 F.2d 168; International Union of United Brewery, etc., 1961, 111 U.S.App.D.C. 383, 298 F.2d 297, supra; NLRB v. Southern Bleachery & Print Works, Inc., 4 Cir. 1958, 257 F.2d 235, supra; NLRB v. The Newton Co., 5 Cir. 1956, 236 F.2d 438; NLRB v. Parma Water Lifter Co., 9 Cir. 1954, 211 F.2d 258, cert. denied, 1954, 348 U.S. 829, 75 S.Ct. 51, 99 L.Ed. 654.

A final point can be covered summarily although by no means casually. Be-

fore the Trial Examiner's hearing in this case the status of Security's guard sergeants was litigated in a representation hearing. Security took the same position that it takes here, i. e., that its guard sergeants were supervisors within the meaning of Section 2(11) of the Act. The Board's Regional Director found the sergeants not to be supervisors within the meaning of Section 2(11) of the Act and therefore included them in the unit. Security filed no request for a review of the Regional Director's decision as provided for in Sections 102.67(b), (c) and (d) of the Board's Rules and Regulations, 29 C.F.R. §§ 102.67(b), (c) and (d) (1967). An election was held, and sergeants voted without challenge. These events may have justified the Board's refusal under Rule 102.67(f)[7] to relitigate the issue of supervisory status; however, the Trial Examiner acknowledged the doubt concerning the term "any *related* subsequent unfair labor practice proceeding"[8] and merely accorded to the Regional Director's decision the customary "persuasive relevance." Since the controlling circumstances of employment remained constant throughout both the representation and the unfair labor practice proceedings, we accept such accordance and, further, note the following statement in the Trial Examiner's decision:

While the Respondent has made an able and vigorous presentation of its position in this matter, its whole defense to the Ashmore discharge appears to have come as an afterthought. Though it did assert and litigate in the representation hearing its contention that sergeants are

supervisory, it waived exceptions to the Regional Director's adverse decision in the matter; permitted its sergeants to vote in the ensuing election without challenge; in its original answer to the complaint in this proceeding admitted the allegation of the complaint designating Ashmore as its employee; in its letter dated 19 October addressed to its Contracting Officer, stated that it discharged Ashmore because of 'poor judgment and inability to maintain good performance,' omitting any reference to supervisory status; and in the Contracting Officer's reply, dated November 2, that individual also omitted any reference to Ashmore's supervisory capacity but instead lumped sergeants and guards together in describing them as 'unofficial representatives of the personnel relations department' and in setting forth the required qualifications for both. 154 NLRB 4, 13.

In an area of law where each case is and must be factually unique, we as the fourth evaluator of this case can find no fault with our three predecessors. The natural alignment of people in their jobs gives rationality to our decision. The natural alignment of Ashmore was not with Security's management. Security magnifies a passing suggestion, a transmitted complaint, a recommended discharge, and a few minor decisions into summit altitudes of genuine supervision. There was no showing, however, that Ashmore's duties gave him the feeling of control, power, or superiority that one finds in a supervisor. His title, badges, and minor decision-making power do not

---

7. The parties may, at any time, waive their right to request review [of the Regional Director's Decision and Direction of Election]. Failure to request review shall preclude such parties from relitigating, in any related subsequent unfair labor practice proceeding, any issue which was, or could have been, raised in the representation proceeding. Denial of a request for review shall constitute an affirmance of the regional director's action which shall also preclude relitigating any such issues in any related subsequent unfair labor practice proceeding. 29 C.F.R. § 102.67(f) (1967).

8. (Emphasis added). The Trial Examiner's discussion is printed at 154 NLRB 4, 11–12, 13. Further discussion may be found at Amalgamated Clothing Workers of America v. NLRB, 1966, 124 U.S. App.D.C. 365, 365 F.2d 898, 902–905 and at NLRB v. Southern Airways Co., 5 Cir. 1961, 290 F.2d 519, 522–523.

complete the picture of a petty panjandrum.

We do have a rule de minimis here. If any authority over someone else, no matter how insignificant or infrequent, made an employee a supervisor, our industrial composite would be predominately supervisory. Every order-giver is not a supervisor. Even the traffic director tells the president of a company where to park his car.

Enforcement granted.