# C & W SUPER MARKETS, INC., Petitioner,

v.

# NATIONAL LABOR RELATIONS BOARD, Respondent.

## No. 77–1904.

United States Court of Appeals, Seventh Circuit.

Argued April 12, 1978.
Decided July 21, 1978.

D. Peter DeBruyne, Rockford, Ill., for petitioner.

Carol A. DeDeo, N.L.R.B., Washington, D. C., for respondent.

Before PELL and WOOD, Circuit Judges, and SOLOMON, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

This matter comes to us on a petition by C & W Super Markets, Inc. (C&W) for review of an order of the National Labor Relations Board (NLRB or Board) requiring C&W to bargain with the retail Clerks Union Local 1354 (union) and to cease and desist from, and compensate certain aggrieved employees for, certain unfair labor practices. The Board has cross-petitioned for enforcement of its order. We deny C&W's petition and enforce the decision and order of the Board.

The facts are as follows. C&W owns and operates a grocery store in Rockford, Illinois. The store's organizational structure includes: the owner and president of the company, Robert Whitely; a store manager; an assistant manager, a slot which was vacant for much of the time period under consideration here; a group of stockers, including a number of department managers responsible for keeping various food departments stocked and smoothly operating; and a variety of other full-time and part-time employees, including cashiers, baggers, guards, office girls, etc.

In 1974, the position of store manager was held by Ken Dillenberg, who was aided by Terry Schabacker as assistant manager. In November of that year, Schabacker resigned his position in order to open up his own grocery store in Vermont. As that venture was not a success, in March of 1975 he asked to return to C&W. Dillenberg could not take him back as assistant manager, since Duane Schmidt had succeeded him in that position. Instead, Schabacker became a stocker, but at his previous hourly wage rate and with greater than normal powers and managerial responsibilities, partly due to his friendship with Dillenberg. Then, on August 4, 1975, Whitely dismissed Dillenberg and made Schmidt store manager. Schmidt decided to get by without an assistant manager for the time being and centralized all powers to hire and fire in himself. Schabacker and a number of other employees including Dennis King, Larry Buchanan, and Marilyn Palumino became concerned about their job security. Buchanan suggested that they try to get a union in the store and Schabacker asked Palumino to phone the Retail Clerks Union, Local 1354. The union sent Velma Skarvan out to talk to the employees about gaining recognition for the union. Over a two or three week period, meetings were held at various employees' homes and signed authorization cards were solicited from other employees, many of them by Schabacker, King and Buchanan. A total of 17 cards were collected by August 11, and four more shortly thereafter.

On August 14, the union sent the company a letter claiming to represent a majority of the employees at the Rockford store and requesting recognition and collective bargaining. The company refused and the union filed a petition with the NLRB seeking an election. After a hearing in late September to determine which employees should be included in the bargaining unit, the Regional Director of the NLRB ordered that an election be held. This order was upheld by the Board and the election was held on December 11, 1975. The union lost the election and filed timely objections.

C&W was charged with numerous unfair labor practices during the course of the

---

* The Honorable Gus J. Solomon, Senior District Judge of the United States District Court for the District of Oregon, is sitting by designation.

election campaign which allegedly undermined and destroyed the union's majority status and made it impossible to hold a fair election. The alleged unfair practices included: threatening and interrogating employees, instructing employees not to engage in union activities, soliciting employee assistance in anti-union activities, promising to reward employees for not supporting the union, discharging and reducing the hours of employees for pro-union activities and for testifying before the NLRB, and refusing to hire a job applicant because of her union sympathies, all in violation of Sections 8(a)(1), (3), and (4) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3), and (4) (the Act). C&W was also charged with refusing to bargain with the union in violation of Sections 8(a)(5) and (1) of the Act, 29 U.S.C. §§ 158(a)(5) and (1).

A hearing was held on these charges before an administrative law judge (ALJ), who found that C&W had indeed committed most of the violations charged. On March 23, 1977, the ALJ issued a decision in which C&W was ordered to cease and desist from any further unfair labor practices; to reinstate employees who had lost their jobs and make the aggrieved employees whole for lost wages; and to bargain with the Retail Clerks Union, Local 1354 as exclusive representative of the employees in the bargaining unit. C&W filed exceptions to the decision and on August 15, 1977, the Board adopted the ALJ's recommended findings and order. C&W now petitions this court to review the final order of the Board pursuant to Section 10(f) of the Act, 29 U.S.C. § 160(f). The NLRB has cross-petitioned for enforcement of its decision and order pursuant to Section 10(e) of the Act, 29 U.S.C. § 160(e).

## I.

### The Supervisory Status of Terry Schabacker, Dennis King and Larry Buchanan

C&W's first attacks on the Board's decision are based on its assertion that the Board erred in not finding that Terry Schabacker, Dennis King, and Larry Buchanan were "supervisors" within the meaning of Section 2(11) of the Act, 29 U.S.C. § 152(11). Such a finding would have two consequences of particular import here. Firstly, since supervisors are excluded from the protections of the Act, any sanctions imposed by the employer against such a person for pro-union activities or sympathies would not generally constitute an unfair labor practice under the Act. See R. Gorman, Basic Text on Labor Law § 6. Secondly, a finding of supervisory status raises the question of whether authorization cards solicited by such a person should be counted in determining whether a union represents a majority of the employees in a bargaining unit, in view of the possibility that the supervisor's solicitation role may have compromised the employees' expression of their true positions. See, e.g., NLRB v. WKRG–TV, Inc., 470 F.2d 1302 (5th Cir. 1973); Flint Motor Inn Co., 194 NLRB No. 115, '72 Lab. L. Rep. (CCH) ¶ 23,738 (1971); Glomac Plastics, Inc., 194 NLRB No. 63, '72 Lab. L. Rep. (CCH) ¶ 23,685 (1971).

Sec. 2(11) of the National Labor Relations Act provides:

(11) The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

The congressional purpose in excepting supervisors from the coverage of the Act was in part to assure that rank-and-file employees could unionize and select their leaders free from undue influence by supervisors in the union, but more important to assure that supervisors—whether organized within a rank-and-file union or organized independently—would not fall into league with or become accountable to employees who they were charged to supervise and thereby renounce the undi-

vided loyalty due the employer. R. Gorman, *supra,* at 34.

*See also NLRB v. Security Guard Service, Inc.,* 384 F.2d 143, 147–48 (5th Cir. 1967); *NLRB v. Pilot Freight Carriers, Inc.,* 558 F.2d 205, 207 (4th Cir. 1977). Thus, in the context of the present case, the concern with regard to the alleged Section 8(a)(1) and (3) violations is whether Schabacker, King and Buchanan were enough a part of management that C&W could rightly demand that they remain loyal to its position in the battle for unionization and discipline them for their pro-union activities. The second consideration is whether they held sufficient power over the employment conditions of the employees from whom they solicited authorization cards so as to constrain the latters' freedom of choice with respect to unionization.

■ In scrutinizing the Board's finding that Schabacker, King and Buchanan were not supervisors within the meaning of the Act, we must remain aware of our limited standard of review. The Board's determination must be upheld if supported by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The facts with respect to the duties of these three employees during the period of time in question are as follows. Schabacker, King and Buchanan were all primarily stockers with responsibility for the day-to-day ordering, pricing, stocking and displaying of grocery items in particular areas of the store (respectively, dairy products, juice and glassware, and frozen foods).[1] Each punched a time clock and was paid on an hourly basis, receiving no benefits different from those received by the other hourly employees. Schabacker earned the same hourly wage as when he was assistant manager, $0.50 more per hour than the next highest paid employee. King and Schabacker both had the authority to cash customers' checks and often reconciled sales

reports with cash register receipts. They both knew the combination to the safe, and Schabacker would sometimes engage in banking transactions for the store involving thousands of dollars, signing drafts issued by Whitely. All three employees would upon occasion open the store in the morning or close it at night. King and Schabacker even had their own sets of keys.

After August 4, none of these three "department heads" had the formal power to hire or fire employees, although Schabacker and King had at least effective power to do so before the August 4 management changeover. Even after this date, Schabacker would occasionally give Schmidt his opinion of the work performance of various employees and sometimes recommend that an employee be let go. However, Schmidt would make his own decisions and often reached a different conclusion. Neither Schabacker, King nor Buchanan had the authority to schedule working hours or vacation for employees or to sign time cards. However, they each had the power to direct other employees to make sure that various routine tasks were taken care of, such as stocking shelves, pricing items, filling empty trays, checking, etc. Determining which tasks should be done when and who should do them clearly involved only a modicum of independent judgment. Moreover, many employees would routinely ask other employees who were not busy to help them stock, check, etc.

In addition to their duties described above, Schabacker and King would rotate as "night managers" in Schmidt's absence. Upon such occasions their powers were somewhat augmented. They had the power to send employees home for disciplinary reasons until the problem could be brought before the store manager the next day, although they had no occasion to do so during the period in question. They had somewhat greater than usual powers to assign employees to various tasks around the store, but invariably they would work from

---

1. However, on their authorization cards Schabacker and King called themselves "head clerk" and "assistant manager," respectively.

an oral or written list of things to be done given them by Schmidt before he left for the night. They would also allow employees to go home early if they were sick or if there was no work left for them to do.

In light of the above facts, we find the question of whether Terry Schabacker was a "supervisor" within the meaning of Section 2(11) to be an extremely close one. He clearly was a supervisor before his departure for Vermont, and probably remained so upon his return, by virtue of his friendship with Dillenberg and his effective power to hire and fire. But the question is whether he could still be considered a supervisor after the August 4 management changeover. That date witnessed a significant shift in his effective powers and C&W presented no evidence that the aura of his previous supervisory status lingered on in the minds of the other employees after the changeover. After August 4, Schabacker continued to carry a significant degree of responsibility to act on the behalf of C&W vis-à-vis the outside world, in terms of cashing customer checks, ordering groceries, opening and closing the store, banking, etc. However, the language of Section 2(11) and the concerns surrounding the supervisor issue in the case at bar center less on the exercise of authority in relation to customers, suppliers and employer assets than on the exercise of "supervisory" authority over other employees.

Of the functions listed in Section 2(11), the most important in this respect is the power to hire and fire. Here, it is clear that after August 4 Schabacker did not have the formal power to hire and fire and we find that the Board's conclusion that he no longer had the effective power to do so is supported by substantial evidence. However, we find that certain other functions listed in Section 2(11) are present to some degree. Schabacker had some power to "suspend" employees from work as part of his responsibilities as "night manager." He also had some power to "assign" employees to jobs and "responsibly to direct them." But these are not dichotomous variables. These factors may be present in widely varying degrees. It was the intent of Congress to distinguish between "minor supervisory employees, on the one hand, and the supervisor vested with . . . genuine management prerogatives . . . ." S.Rep.No.105, 60th Cong., 1st Sess. 4 (1947), cited in *NLRB v. Security Guard Service, Inc.*, 384 F.2d at 147. As was stated by Judge Waterman in *NLRB v. Metropolitan Life Ins. Co.*, 405 F.2d 1169, 1172 (2d Cir. 1968):

> Inasmuch as infinite variations and gradations of authority can exist within any one industrial complex and any drawing of the line between the personnel of management and the rank and file workers may require some expertise in evaluating actual power distributions which exist within an enterprise, the Board's findings relative thereto are entitled to great weight.

In this area, "of necessity a large measure of informed discretion is involved in the exercise by the Board of its primary function to determine those who as a practical matter fall within the statutory definition." *NLRB v. Swift & Co.*, 292 F.2d 561, 563 (1st Cir. 1961). *Accord, NLRB v. American Oil Co.*, 387 F.2d 786, 788 (7th Cir. 1967).

In the present case we reach a conclusion similar to that expressed by the Supreme Court in *Bayside Enterprises, Inc. v. NLRB*, 429 U.S. 298, 304, 97 S.Ct. 576, 50 L.Ed.2d 494 (1977), in that "regardless of how we might have resolved the question as an initial matter, the appropriate weight which must be given to the judgment of the agency whose special duty is to apply this broad statutory language to varying fact patterns requires enforcement of the Board's order." Although the functions covered by Section 2(11) are listed disjunctively, *NLRB v. Elliott-Williams Co.*, 345 F.2d 460, 463 (7th Cir. 1965), we do not believe that Schabacker's power as "night manager" to suspend employees until the problem could be brought to the attention of the store manager the next day militates against a Board finding that Schabacker was an employee rather than a supervisor. Nor do we believe that the existence of his

limited powers to assign work require a contrary finding in view of the routine nature of the assignments, the limited amount of independent judgment required, and the informal and diffuse character of the distribution of such powers within the store. We have examined the other NLRB cases in this area cited by the Board and by C&W and find that the present case does not represent a significant departure from a clearly established pattern. *Compare, e.g., Luoma's Foods, Inc.*, 206 NLRB 1, 84 LRRM 1290 (1973) and *Dorance J. Benzschawel and Terrence O. Swinger, Copartners, d/b/a Parkwood IGA Foodliner*, 210 NLRB 349 (1974) and *Foote's Dixie Dandy*, 223 NLRB No. 203, 92 LRRM 1276 (1970) *with Angeli's Super Valu*, 80 LRRM 1282 (1972) and *NLRB v. Crean, d/b/a Grand Food Market*, 326 F.2d 391 (7th Cir. 1971) and *NLRB v. Kolpin Bros. Co., Inc.*, 379 F.2d 488 (7th Cir. 1967).[2] Although this is a close case, we will therefore defer to the Board's conclusion that Schabacker falls within the protection of the Act with regard to the period of time in question. A *fortiori* we will defer to the Board's conclusions that King and Buchanan were not supervisors within the meaning of the Act,

given their more limited powers during this period.

## II.

### C&W's Unfair Labor Practices

The Board found that in the campaign leading up to the December election C&W engaged in a variety of conduct violative of Section 8 of the Act which undermined and destroyed the union's majority status. On appeal, C&W claims that the Board's findings were not supported by substantial evidence on the record as a whole. We disagree.

▮ Briefly, the Board found that C&W violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1),[3] by engaging in the following conduct. The company interrogated certain employees and their relatives "in an atmosphere of animosity towards the union . . . directed toward discovering [the] identity of the union organizers." *NLRB v. My Store, Inc.*, 345 F.2d 494, 497 (7th Cir. 1965).[4] The company made threats[5] and instructed certain employees to refrain from union activities.[6] One employee was asked by another, whom the Board found to be acting as the agent of the company, to supply "legitimate" reasons for discharging

2. We note that in the two appellate cases the courts considered the supervisor question to be a close one, but deferred to the Board's informed discretion.

3. Section 8(a)(1) provides:
(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title.

4. The Board found that Whitely tried to learn from Schabacker whether Larry Buchanan was behind the union move and told Schabacker that he would "close the door" before letting a union in. In addition, Whitely once approached Dennis King's wife who was shopping in the store and asked her whether her husband was for him or the union. Both findings were based on the ALJ's not unreasonable decision to discredit Whitely's version of the events.

5. In addition to Whitely's threat to close the store, mentioned in n. 4, *supra*, the Board cited an incident in which Whitely called King into his office to discuss the union and told him that there had been a union in another store owned

by him, but that between the time the union won the election and the time that it became installed in the store, the employees who voted for it were no longer there. In response to C&W's claim that this conversation was equivocal and not inherently coercive, it must be noted that the test is not whether the employer's motive was to coerce or whether the coercion succeeded or failed, but whether the conduct tends to interfere with the employees' free exercise of their rights under the Act. *NLRB v. Illinois Tool Works*, 153 F.2d 811, 814 (7th Cir. 1946), and that the words "must be judged by their likely import to [the] employees." *Wausau Steel Corp. v. NLRB*, 377 F.2d 369, 372 (7th Cir. 1967).

6. The Board found that when Greg Buban was hired in late August, Schmidt told him not to sign a union card. A week later Schmidt told him to do whatever he thought best, but that he should try and remain neutral. Here, the ALJ credited Buban's testimony over Schmidt's. We also agree with the Board that the second conversation was not curative of the coercive tendencies of the first.

pro-union employees.[7] Lastly, employees were promised benefits for siding with management.[8] In each of these instances, the record substantially supports the Board's findings.

The Board also concluded that C&W violated Section 8(a)(3) [9] and (1) of the Act, 29 U.S.C. §§ 158(a)(3) and (1), by refusing to hire, reducing the hours of, and discharging various employees because of their pro-union activities and sympathies. In opposition to the Board's findings in this regard concerning Larry and Nancy Buchanan, C&W argues that their discharge was due to their inability to get along with their fellow employees, rather than their union activities. Although there is some evidence in the record of a few instances of friction with other employees, it has long been recognized that "the existence of valid grounds for punitive action is no defense unless such action was predicated solely on these grounds and not by a desire to discourage protected activity." *NLRB v. Fairview Hospital,* 443 F.2d 1217, 1219 (7th Cir. 1971). Here, the evidence readily supports an inference that the Buchanans were discharged largely because of union activities.[10] The evidence also supports the Board's conclusion that Dino Palumino was discharged in part because of union activities.[11] Lastly, the Board found that C&W refused to hire Pamela Garrison because she stated that she supported the union. The primary question concerning this incident is whether to believe Garrison's version, or that of the store manager, Schmidt. We do not find the ALJ's decision to credit Garrison's testimony over Schmidt's to be unreasonable.[12]

As a final matter the Board found that C&W violated Sections 8(a)(3) and (1) by reducing the working hours of Schabacker, King and Marilyn Palumino and that the reduction of Schabacker's hours also violat-

---

7. The Board found that when Terri Mitchell sought reemployment with the company, she was told by Mary Loos that "those who valued their job" should vote against the union. Later, Mitchell revealed to Loos, who was her friend, that she had signed a union card and asked how she could make it up to her. Loos sent her to Whitely, to whom she admitted having signed a statement to the union indicating that she had been hired to vote against the union. Mitchell offered to make a retraction and Whitely told her that she was "on the right track." Later, Loos told her that certain pro-union employees had been marked for discharge and told her that if she could supply any "legit" reason for such an action, she should do so. C&W denies that Loos was acting as its agent in making these statements. Although we find the question to be a close one, we cannot say that the Board's finding is not supported by substantial evidence on the record as a whole. The test is whether Mitchell would have "just cause to believe that . . . [Loos was] acting for and on behalf of the management." *International Ass'n of Machinists v. NLRB,* 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50 (1940); *NLRB v. American Casting Service, Inc.,* 365 F.2d 168, 173 (7th Cir. 1966). The ALJ reasonably chose to credit Mitchell's testimony over that of Schmidt and Whitely and found that Loos was acting as a "conduit" for the latter two.

8. After the September NLRB hearing, Whitely stated in the presence of a group of employees that "[a]nyone who sticks with me through this thing will be justly rewarded."

9. Section 8(a)(3) provides in pertinent part:
 (a) It shall be an unfair labor practice for an employer—
 \* \* \*
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization
 . . . .

10. This inference is supported by the fact, *inter alia,* that the Buchanans received raises shortly before being fired and that their discharge came shortly after Whitely found out from Schabacker that Larry Buchanan was behind the decision to call the union. See n. 4, *supra.*

11. There is support in the record for C&W's contention that Dino was a slow worker who clowned around a lot and sometimes used foul language. However, there is also substantial evidence in support of the NLRB's position that an additional reason for his discharge was the pro-union activity displayed by him and his mother. For one thing, Dino's work habits were manifest long before his discharge, yet with one exception he was never warned about his unsatisfactory behavior or otherwise disciplined until the advent of the union campaign. The ALJ's decision not to credit Schmidt's testimony here was not unreasonable.

12. Among other things, the ALJ relied on the fact that Schmidt's hearing testimony as to why he did not hire Garrison was inconsistent with his prior affidavit.

ed Section 8(a)(4) of the Act.[13] C&W argues that the reductions were undertaken because of a decline in the work performance of the three employees involved. Although there was some testimony by the employer's witnesses that Schabacker and King were taking longer than usual breaks and "goofing off," and although it is to be expected that a union organizing campaign would disrupt normal efficiency to some degree, the ALJ not unreasonably decided not to credit the testimony of Whitely and Schmidt on the reasons for the reductions. Thus, the Board found by the preponderance of the evidence that the hours of these three employees were reduced because of their union activities, and in Schabacker's case, because of his testimony before the Board at the September hearing. Although the question is a close one with respect to Marilyn Palumino, we find that there is substantial evidence in the record that the reductions were at least in part motivated by impermissible considerations.[14]

### III.

### *The Bargaining Order*

 The Board found that at the start of the union's drive for recognition a majority of the 31 employees in the bargaining unit favored the union, as is evidenced by the fact that 21 employees signed authorization cards. It also found that beginning

August 22, C&W engaged in extensive unfair labor practices in order to sabotage the union's organizational drive, undermine its majority status, and inhibit the election process. This was found to constitute a violation of Section 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5) [15] and C&W was ordered to recognize and bargain with the union. Under *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 613–14, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1968), the Board may issue a bargaining order such as the one issued here if it finds that (1) the union possessed majority status prior to the company's unfair labor practices; (2) the unfair labor practices caused this majority to dissipate; and (3) less drastic remedies would be insufficient to overcome the impact of past unfair practices or to deter similar future conduct so that a fair election could not be held within a reasonable time. *Walgreen Co. v. NLRB*, 509 F.2d 1014, 1017 n.2 (7th Cir. 1975). It is expected that the Board will undertake a "detailed analysis" and make "specific findings" with respect to each of these questions. *Peerless of America, Inc. v. NLRB*, 484 F.2d 1108, 1118–19 (7th Cir. 1973). The Board's opinion in the present case is less than exemplary in this regard, particularly concerning the inadequacy of less drastic remedies. However, since we find that the record here supports the issuance of a bargaining order, we will refrain from remand-

---

13. Section 8(a)(4) provides:

(a) It shall be an unfair labor practice for an employer—

 \* \* \*

(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter;

14. The Board's conclusion with respect to Schabacker is supported *inter alia* by statements made by Whitely to the latter after the September NLRB hearing. In addition, the Board found that when Schabacker asked Schmidt why his hours had been reduced, Schmidt replied, "Terry, you blew it, but, for the record, your hours were cut because business is down." A few days later Schmidt responded to Schabacker's complaints by saying, "Terry, the only way you're going to have a future with this company is to talk to the old man [Whitely]." The Board found the testimony of the employer's witnesses to be "inconsist-

ent and conflicting" and noted that the timing of the reductions and the failure of C&W to investigate the reports of work problems or to confront the employees in question with the charges suggest that the work related problems were not the true motivation behind the reductions.

We also find that the evidence in the record concerning Whitely's reactions after the September 30 NLRB hearing supports the Board's conclusion that Schabacker's hours were reduced in part because he testified against the company in that proceeding.

15. Section 8(a)(5) provides:

(a) It shall be an unfair labor practice for an employer—

 \* \* \*

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

ing to the NLRB for further findings. *See Walgreen Co. v. NLRB,* 509 F.2d at 1018–20.

Other than the question of whether a number of the authorization cards were suspect because they were solicited by "supervisors," which has been resolved against C&W, the company has not suggested anything which places in doubt the conclusion that the union represented a majority of the employees in the bargaining unit before the occurrence of the unfair labor practices. We also find that there is substantial evidence on the record that C&W's unfair practices undermined and destroyed that majority. The company fired three of the major union supporters and reduced the hours of three others.[16] These actions, along with the various 8(a)(1) violations made it clear that the company was strongly opposed to the union and that those who supported it would be punished and those who opposed it rewarded. Other company actions created an atmosphere of surveillance and attempted to pressure certain employees into joining in the unfair practices against the union adherents. The company argues that its actions were only directed towards isolated individuals, rather than the employees as a whole. However, given the smallness of the bargaining unit, the company's message of union animus came across loud and clear. Although it did not coerce the core union supporters into changing their positions, it is reasonable to conclude that it may have pushed some of the more marginal union supporters into voting against the union. A less drastic remedy than a bargaining order might have brought the discharged employees back into the unit and enjoined future unfair practices, but it is reasonable to conclude that the lingering effects of the past unfair practices would not soon be dissipated. We therefore find substantial support for the Board's decision that the employee sentiment expressed in the authorization cards would best be protected by a bargaining order.

The order of the NLRB is ENFORCED and the petition of the company is DENIED.

---

16. In addition to the instances of reductions in working hours discussed in the previous section, the Board found that Diane Ashbury's hours were reduced because she was suspected of being a union adherent. This finding has not been challenged on appeal.